RONALD J. SABALLUS, Plaintiff-Appellee and Cross-Appellant, *v.* VERNON H. TIMKE, Defendant-Appellant and Cross-Appellee.

First District (5th Division)    No. 82—2131

Opinion filed December 30, 1983.—Rehearing denied March 12, 1984.

Greenberger, Krauss & Jacobs, Chartered, of Chicago (Stephen A. Cohen and Cynthia Gray, of counsel), for appellant.

Burditt & Calkins, of Chicago (C.D. Kasson, Robert G. Epsteen, and P. Scott Polisky, of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial in which the trial court found that plaintiff's acts constituted events of default under the terms of plaintiff's and defendant's partnership agreement, the trial court awarded plaintiff $53,682.60 as the value of plaintiff's interest in the partnership. Defendant appeals, and plaintiff cross-appeals from the court's findings.

In his appeal defendant argues that the trial court erred: (1) in not imposing a constructive trust over two lots fraudulently withheld from the partnership by plaintiff, and not including their value in the settlement of accounts; (2) in refusing to deduct $137,475 from the purchase price of plaintiff's interest in the partnership; (3) in deduct-

ing $72,868.77 from the purchase price in the calculation for the settlement of accounts; (4) in denying him attorney fees; (5) in denying him interest on monies appropriated from partnership funds; (6) in denying him punitive damages; and (7) in denying him prejudgment interest.

In plaintiff's cross-appeal, he argues that the trial court erred by (1) terminating his interest in the partnership; (2) including certain items in the settlement of accounts calculation, and (3) awarding certain costs to defendant.

Relevant to the disposition of this case are the following facts.

Plaintiff, a general contractor and president of The Saballus Companies, Inc., in 1977 contracted to purchase for $288,000 four parcels of land in Oak Brook, Illinois. The purchase agreement was subject to several contingencies, principally, obtaining a building permit for the construction of a three-story office building. He made a $15,000 down payment and obtained a loan for the balance. Upon securing the necessary permits and preliminary financing commitments, he began construction of the building in July 1977 and supervised it to its completion. Pursuant to the partnership agreement, he also undertook securing tenants and leaseholds at no profit to The Saballus Companies.

On September 14, 1977, plaintiff conveyed Parcels A and B, two of the four original lots into a land trust at La Grange State Bank and retained Lots 1 and 2 in a land trust at Northwest National Bank. Defendant, a real estate developer whom plaintiff had met that August and who had agreed to forming a 50-50 joint venture, borrowed $300,000 from La Grange State Bank and made the following payments to plaintiff totaling $315,594.66: (a) $273,000 in principal on the loan; (b) $4,974.66 in interest due; (c) $36,500 as a standby fee, and (d) $1,120 for tree removal and a sign.

Subsequently, he and defendant entered into a partnership agreement, effective November 1, 1977, which provided *inter alia* that the partnership would acquire certain real estate described in exhibit No. 1 attached thereto and would improve it with a three-story office building known as "Midwest Plaza North." Plaintiff agreed to transfer the two lots described in exhibit No. 1 in the partnership agreement into the partnership land trust at its "original cost" of $288,000.

They further agreed as follows: (1) each would own a 50% interest in the partnership and make an initial capital contribution of $150,000 in cash or property; (2) each would advance, when due, his *pro rata* share of all costs and expenses with respect to the operation of the

partnership and the ownership of any partnership property; (3) defendant, however, would be obligated to loan plaintiff up to $100,000 during the interim loan period, and, if this amount exceeded $100,000 the default provisions of the agreement would apply; (4) upon default, the nondefaulting partner had the right to terminate the defaulting partner's interest without effecting a termination of the partnership upon written notice and opportunity to cure; and (5) in the event of such termination, the nondefaulting partner would be required to purchase the defaulting partner's interest in the partnership pursuant to a stated formula. Plaintiff assigned his beneficial interest in the land trust at La Grange State Bank to the partnership on November 18, 1977.

Various financial transactions between the partners followed and each was shown on the books as having made an initial capital contribution of $147,691. Pursuant to the agreement, the partners continued the construction of Midwest Plaza North and sought, in turn, construction, interim, and permanent financing (*i.e.*, the mortgage or "end loan") for the building.

After receiving funds from the construction loan, both partners withdrew $77,131 from the partnership capital account which reduced their respective cash investment to $70,560. For reasons not relevant to our discussion, defendant loaned plaintiff $75,000 during this interim loan period.

Following completion of the office building in June 1978, plaintiff continued to arrange for the leasing of office space and building maintenance until February 1979.

The instant appeal arises from the partners' dispute over each other's conduct in the months preceding the end loan closing for the office building which was scheduled for January 11, 1979. Testimony adduced at trial indicates that the $1,700,000 construction loan for the building, provided by Elmhurst National Bank in conjunction with another bank, would be refinanced at the end of the construction period by Percy Wilson Mortgage and Finance Company (Percy Wilson), as agent for the permanent lender, the Mutual Benefit Life Insurance Company, which issued a commitment to provide the $1,825,000 end loan for the building. Neither party dispute that this commitment was due to expire on January 11, 1979, or that most of the end loan funds were later utilized to pay off the balance of the construction loan.

As was typical for the financing of a newly constructed building, the permanent lender required the partnership, as mortgagor, to deposit additional money at the time of the end loan closing as security in the event that the end loan did not provide sufficient funds to pay

off the construction loan or provide a title indemnity fund for various construction related liens.

At trial, plaintiff testified that in the fall of 1978 the partnership received a document from the permanent lender indicating all the requirements for end loan closing. He stated that he met with defendant's employee, Joan Vella, in October or November, 1978, to discuss the amount of money, if any, needed for the end loan closing because the partnership books were kept by defendant. On direct examination, the following colloquy occurred:

"Q. What do you recall of discussions regarding monies that might be due at the end of the end loan closing?

A. Well, the numbers were very confusing. The numbers that would be used at the end loan closing varied all the way from we wouldn't require anything to *** $400,000. *** Well, I couldn't comprehend how that amount of money would be required, and I asked for a more accurate accounting to demonstrate exactly what funds would be required. ***

Q. Did Miss Vella provide those records on that accounting at that meeting?

A. No.

Q. Did you make any additional requests for such an accounting [to the Timke office] prior to the end closing?

A. Yes. ***

Q. Did you receive [these] records ***?

A. No.

Q. Have you ever received such records?

A. Yes. *** When the deposition documents were submitted [during the lawsuit]."

Plaintiff further testified that in late December of 1978 he informed defendant by telephone that he would not provide any funds unless he received an accurate accounting. Defendant responded that his office was working on the accounting and not to worry about the funds for the closing because he would furnish them.

On January 9, 1979, the permanent lender advised the partnership that based upon figures provided by defendant, $274,950 would be needed to fund the end loan. It is undisputed that defendant knew plaintiff was in Hawaii during this time and when contacted there by the vice-president of his company, plaintiff testified that he then telephoned to inform defendant that he would be unable to contribute any monies for the end loan closing two days later.

On January 11, 1979, defendant advanced $277,000 ($275,000 plus interest) to meet the end loan funding requirement and by letter

dated January 12, 1979, defendant notified plaintiff that he was electing to terminate plaintiff's interest in the partnership due to plaintiff's failure to pay one-half of the amount advanced at the end loan closing.

Subsequently, plaintiff withdrew $64,162 on February 21, 1979, and $120,475 on March 8, 1979, from the money deposited by defendant at the end loan closing into the partnership's indemnity account at the Chicago Title Insurance Company, and deposited these sums into an account he established at the Bank of Elmhurst. Plaintiff, the sole signator on this account, alter deposited an additional $2,182.56 in partnership funds and of the $186,819.56 in partnership funds he deposited, made the following payments: (1) $146,715.34 for various partnership obligations; (2) $25,194.70 for payments due to The Saballus Companies as general contractor; and (3) $67.18 for check-printing costs.

With a $14,842.24 balance remaining on December 31, 1979, plaintiff paid his wife $14,800 as a real estate brokerage commission for her services in procuring a lease to the General Services Administration and closed the account after retaining the remaining balance of $42.34.

On February 20, 1979, plaintiff filed a two-count complaint against defendant seeking, *inter alia*, an accounting and the appointment of a receiver. Count III of the amended complaint sought dissolution of the partnership and alleged that the partnership had had sufficient funds to fund the end loan without a contribution from the partners. Subsequently, count IV was added wherein plaintiff alleged that he had not breached the agreement since the $275,000 that defendant had paid to the fund the end loan was a loan to the partnership. During discovery, defendant learned that four lots had been included in the original purchase price of $288,000.

Following a bench trial, the trial court found the following acts committed by plaintiff to be "events of default" under article 14.01 of the agreement that authorized defendant to terminate his partnership interest:

(1) plaintiff's failure to contribute his *pro rata* share for the end loan closing;

(2) plaintiff's establishment of an account at the Bank of Elmhurst under his sole control with $186,819 in deposits into and withdrawals from the account of partnership funds without defendant's consent;

(3) the payment of $14,800 to plaintiff's spouse as a purported real estate commission;

(4) plaintiff's failure to disclose to defendant that the purchase

cost of $288,000 included two parcels of land in addition to those conveyed to the partnership.

The trial court declared plaintiff's partnership interest to have been terminated as of January 22, 1979, and entered judgment in favor of defendant. The court awarded plaintiff $83,792.34 as the value of his share of the terminated interest in the partnership. The court calculated this amount by determining that plaintiff's total cash investment was $72,868.77 and subtracting that sum from plaintiff's debts of $137,475 for the end loan share, $14,800 for the payment to plaintiff's wife, $4,276.59 for a payment made to The Saballus Companies after termination of plaintiff's partnership interest on January 22, 1979, $67.18 for check printing costs, and $42.34 for the balance remaining at the Bank of Elmhurst account which plaintiff had retained upon closing the account.

Defendant's requests for interest, punitive damages, attorney fees, and the imposition of a constructive trust on the unincluded parcels, or the deduction of their value in the calculation on the settlement of accounts were denied.

Following a hearing on plaintiff's post-trial motions, the decree was modified so as to not include $137,475 as a partnership debt of plaintiff. Judgment against defendant was entered in the amount of $53,682.66.

Defendant appeals from that portion of the modified decree which denied him: (1) compensatory and punitive damages; (2) imposition of a constructive trust on the two parcels of land plaintiff withheld from the partnership and retained in his own land trust; (3) interest; (4) attorney fees; and which (5) excluded $137,475 from the calculation in the settlement of the accounts.

Plaintiff cross-appeals from (1) the termination of his partnership status, (2) the inclusion of certain items in the settlement of accounts calculation, and (3) the award of $17 in costs to defendant.

OPINION

The seminal question here is whether the trial court erred in terminating plaintiff's interest in the partnership. We initially point out that the briefs of both parties center on the question of whether the trial court properly calculated the purchase price of plaintiff's interest in the partnership. However, in view of the equitable issues involved, we have necessarily examined the record as a whole to determine whether defendant's right to terminate plaintiff's interest in the partnership and pay $53,682.60 for plaintiff's interest in the two-man partnership, whose assets were in excess of $2.1 million at the time of

trial, was clearly and unequivocally shown.

■ The Illinois Partnership Act is based on the Uniform Partnership Act (the U.P.A.). Under the U.P.A. (Ill. Rev. Stat. 1981, ch. 106½, par. 1 *et seq.*) a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." The requisites of a partnership are (1) the parties have joined together to carry on a trade or venture for their common benefit; (2) each contributes property or services; and (3) each has a community of interest in profits. *Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 120 N.E.2d 546.

■ While written articles of agreement are not necessary to create a partnership (*Allen v. Amber Manor Apartments Partnership* (1981), 95 Ill. App. 3d 541, 420 N.E.2d 440), partners have the right to establish between themselves by a partnership agreement or by a dissolution agreement, their rights, duties, and obligations so far as the partnership is concerned. *Meyer v. Sharp* (1950), 341 Ill. App. 431, 94 N.E.2d 510.

■ As a general rule, a court must construe a partnership agreement as any other contract so as to determine the intent of the parties. (*Estate of McKay v. Moses* (1976), 35 Ill. App. 3d 458, 343 N.E.2d 45; *Niehoff v. Dudley* (1866), 40 Ill. 406, 408.) However, in determining the relationship of the parties under such an agreement, a court looks to substance and not to form. *Maimon v. Telman* (1968), 40 Ill. 2d 535, 240 N.E.2d 652.

■ The case at bar exemplifies the classic example of the two-man partnership in which one partner contributes only capital and no service while the other contributes services, but no capital. As explained in H. Reuschlein & W. Gregory, Handbook of the Law of Agency and Partnership 267 (1979), "Once a partnership has been formed, certain consequences follow as to the relations between the partners. First, the relationship of partners is that of mutual agents ***. Second, the relationship is one of a fiduciary nature. Third, as to the specifics, the U.P.A. provides a number of rules which apply in the absence of contrary agreement. In sum, partners are free to vary many aspects of their relationship inter se, but they are not free to destroy its fiduciary character."

I

We first consider defendant's argument that we should hold as a matter of law, that the following actions by plaintiff constituted a repudiation of the partnership agreement and termination of his interest: (1) plaintiff's failure to contribute his *pro rata* share for the end

loan closing; (2) plaintiff's establishment of a partnership account at the Bank of Elmhurst under his sole control with $186,689 in deposits into and withdrawals from the account without defendant's consent; (3) the payment of $14,800 to plaintiff's wife as a real estate commission and (4) plaintiff's failure to disclose to defendant that the purchase cost of $288,000 originally included tow parcels of land in addition to those conveyed to the partnership.

After considering all the evidence, the trial court concluded that plaintiff had breached the agreement in these respects and applied the forfeiture and purchase price formula provisions of article 14.

Initially, we have examined the respective fiduciary obligations of the partners in the case at bar. It is clear from an examination of the record that the nature of the business for which the co-partnership was created was such that not only was capital, skill and labor required to carry on the business, but that an absence of mutual confidence and good faith would force the co-partnership to cease.

Fiduciary duties between partners have been likened to "a sliding scale of obligations which depend on a variety of factors," and therefore a court must examine the relationship between the parties in each case so as to ascertain the standard to be applied to determine whether there has been a breach of a partner's fiduciary duty. A. Conard, R. Knauss & S. Siegel, Agency, Associations, Employment, Licensing & Partnerships 483 (2d ed. 1977).

While defendant persistently argues on appeal that plaintiff breached their contractual agreement by failing to provide a *pro rata* share of the end loan requirement and must suffer the consequences of having his 50% partnership interest terminated, the circumstances surrounding the end loan indicate that defendant himself breached his fiduciary duty by failing to render information on demand and to render an accounting to his partner.

■ Defendant, as financial captain of the venture, retained possession and control of the partnership books. As clearly, enunciated elsewhere, "[W]here one partner takes on the role of a 'manager' or 'director' his obligation to deal fairly and openly and disclose completely is heightened. It has been aptly described in the following terms: 'Where one of the members acts as "captain" or "manager" of the venture the necessity for a full disclosure becomes more acute and rests more heavily on him.' " (*Application of Lester* (1976), 87 Misc. 2d 717, 723, 386 N.Y.S.2d 509, 513, partially quoting from *Libby v. L. J. Corp.* (D.C. Cir. 1957), 247 F.2d 78, 82, see Beane, *The Fiduciary Relationship of a Partner, 5 J. Corp. Law* 483, 491 (1980).) Moreover, our supreme court has held that when there is a question of breach of

fiduciary duty of a managing partner, all doubts will be resolved against him and the managing partner has the burden of proving his innocence. *Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 78, 115 N.E.2d 323.

■ As a general rule, one of the ordinary duties of partners is to keep true and correct books showing the firm accounts, such books being at all times open to inspection by all members of the firm. (See 60 Am. Jur. 2d *Partnership* secs. 123, 192 (1972).) Section 19 of the U.P.A. (Ill. Rev. Stat. 1981, ch. 106½, par. 19) expressly provides that "The partnership books shall be kept, subject to any agreement between the parties, at the principal place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them." Partners also must render on demand true and full information of all things affecting the partnership to any partner. Ill. Rev. Stat. 1981, ch. 106½, par. 20.

■ Under the U.P.A. therefore, any partner has the right to a formal accounting as to partnership affairs if he is wrongfully excluded from the partnership business or possession of its property by his co-partners, or *"[w]henever other circumstances render it just and reasonable."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 106½, par. 22.) Thus, a wrongful exclusion, or "freeze-out," of one partner by a co-partner from participation in the conduct of the business or from the management of the partnership business, will be grounds for judicial dissolution. (*Heyman v. Heyman* (1904), 210 Ill. 524, 71 N.E. 591.) In *Heyman*, our supreme court stated that "[a]mong the acts and circumstances, which had been deemed sufficient to justify a decree of dissolution, are the following: 'Excluding a partner from any voice in the management of the business, and disregard of his advice and wishes; irreconcilable differences and personal ill-will between the partners, rendering co-operation in the business impossible; refusal to keep accounts open to the co-partners, to account at reasonable times, and to pay over profits as agreed." *Heyman v. Heyman* (1904), 210 Ill. 524, 541.

In the instant case, the record reveals that (1) defendant, a sophisticated entrepreneur and real estate developer, provided the figures used to estimate the end loan debt to the permanent lender; (2) defendant reassured plaintiff until the time of the end loan closing that he would take care of the funding; (3) while the nature of defendant's $275,000 advance is much-disputed, it is in fact listed on the partnership books as a note payable to defendant, and may well be characterized as a loan to the partnership; (4) it is apparent from the record that certain partnership funds available to cover the end loan debt, from both the partnership funds and from the secondary source

of the partners' joint venture, the Timke/Saballus Joint Venture, were not utilized to fund the end loan; and (5) plaintiff, who repeatedly requested access to the partnership books kept by defendant in order to determine the accuracy or source of these figures, was both "put off" and denied access to the partnership books, by either defendant or his agents, prior to the end loan closing.

Although we are cognizant that plaintiff was responsible for most of the services required to construct, develop, lease and maintain their project, Midwest Plaza North, it is also clear that (1) plaintiff did not disclose to defendant that four lots were included in the original purchase price of $288,000; and (2) although he did pay partnership obligations out of the Bank of Elmhurst account, he did not obtain defendant's consent in order to establish the account.

■ Thus, although it would be difficult to decide which of the parties is most in the wrong, we believe that equity demands a decree of dissolution in this case, where, as here, the relations existing between the partners render it impracticable for them to conduct business beneficially. *Mandell v. Centrum Frontier Corp.* (1980), 86 Ill. App. 3d 437, 407 N.E.2d 821.

Our determination that a dissolution and accounting and not a termination of plaintiff's partnership interest is proper is further buttressed by the equitable maxim that forfeitures are not favored by the law (*Harlev v. Sanitary District* (1903), 107 Ill. App. 546), and, a party "will be relieved from a technical forfeiture of rights under a contract if injustice results from its enforcement" (*Krentz v. Johnson* (1976), 36 Ill. App. 3d 142, 145, 343 N.E.2d 165) where such right is not clearly and unequivocally shown. *Richards v. Liquid Controls Corp.* (1975), 26 Ill. App. 3d 111, 325 N.E.2d 775.

## II

We next address defendant's contention that a constructive trust should be imposed upon the two withheld lots pursuant to section 21 of the U.P.A. (Ill. Rev. Stat. 1981, ch. 106½, par. 21), which ordinarily requires a partner to hold any profits derived by him without the consent of the other partner as a trustee for the partnership.

■ The record discloses that these two lots were sold at a sheriff's sale in December 1982 to satisfy a judgment in favor of defendant himself on the $75,000 note payable to him by plaintiff, and at no time has defendant argued that this sale was fraudulent. While we do not condone plaintiff's nondisclosure, we find that the doctrine of election of remedies is applicable, where, as here, a party would receive a double recovery (*District 141, International Association of*

*Machinists v. Industrial Com.* (1980), 79 Ill. 2d 544, 550-51, 404 N.E.2d 787, 789). Consequently, we find that it would be inequitable to again include their value in the settlement between the parties.

### III

Finally, we note both parties' arguments concerning the propriety of the $14,800 payment to plaintiff's wife, a licensed real estate salesman, for services rendered in procuring a lease worth approximately $1,000,000 from the General Services Administration.

While we do not reach the merits of the issue we recognize the provisions of the relevant statute (Ill. Rev. Stat. 1981, ch. 111, par. 5727(d)), which states that a real estate commission is recoverable only if a licensed real estate broker is involved. We therefore express no opinion as to the merits of this matter in the absence of further proceedings.

### IV

In light of our decision, we do not reach the other issues raised on appeal. For reasons we have previously discussed, we find that portion of the judgment which terminated plaintiff's interest in the partnership and calculated the purchase price of said interest must be reversed and remanded for a complete dissolution, accounting and winding up of the partnership affairs consistent with the provisions of sections 29 through 43 of the U.P.A. (Ill. Rev. Stat. 1981, ch. 106½, pars. 29 through 43). The judgment is affirmed as to the issues relating to (1) interest, (2) attorney fees and costs, and (3) punitive damages.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part; and remanded.

Affirmed in part, reversed in part, and remanded.

WILSON, P.J., and MEJDA, J., concur.