THOMAS G. CRONIN, Counterplaintiff-Appellant, v. DANIEL F. McCAR-THY, Defendant-Appellee.

First District (1st Division)    No. 1—92—4317

Opinion filed June 30, 1994.

Murphy & Boyle, Chartered, of Chicago (Robert D. Boyle and Morgan F. Murphy III, of counsel), for appellant.

Anthony J. Pauletto, of Skokie, for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, the circuit court of Cook County entered judgment in favor of defendant Daniel F. McCarthy on defendant and counterplaintiff Thomas G. Cronin's first amended countercomplaint in chancery for injunction, accounting and other relief. Counterplaintiff now appeals.

The record on appeal indicates the following facts. On September 29, 1979, Philip Corboy filed a "Complaint in Chancery for an Accounting and Other Relief" against McCarthy and Cronin. The complaint alleges that Corboy entered into an oral partnership agreement with McCarthy and Cronin for the purpose of erecting, owning and operating an office building in Skokie, Illinois, known as the Westmoreland Building. Corboy alleged that McCarthy was to be the managing partner, receiving 81.5% of the profits, whereas Corboy and Cronin were each to receive 9.25% of the profits. Corboy also alleged that McCarthy submitted statements to Corboy and Cronin that understated the income received by the partnership and overstated losses incurred. Corboy further alleged that McCarthy withdrew partnership funds for McCarthy's own use and for nonpartnership uses and that some of these withdrawals were disguised as legitimate partnership expenses.

On December 10, 1981, McCarthy filed a countercomplaint against Cronin, relating to services allegedly negligently performed by Cronin on behalf of the partnership. On January 29, 1982, Cronin filed a cross-complaint against McCarthy that largely mirrored the initial complaint filed by Corboy. On February 20, 1986, Corboy and McCarthy filed a stipulation to dismiss that indicated that these two parties had settled their dispute. The circuit court entered an order that same day, dismissing Corboy's complaint against McCarthy with

prejudice, but noting that said dismissal did not affect the dispute between McCarthy and Cronin.

On February 5, 1990, the trial court granted Cronin's motion to voluntarily dismiss his cross-complaint against McCarthy. On March 12, 1990, the trial court granted Cronin leave to file his first amended countercomplaint against McCarthy. In the first amended countercomplaint, Cronin repeats the allegation that McCarthy withdrew partnership funds for personal and nonpartnership uses. The first amended countercomplaint also alleges that McCarthy intentionally or negligently miscalculated Cronin's share of the partnership. Cronin alleged that his interest in the partnership should be 13.3891%, rather than 9.2594%.

The following facts were adduced at trial. Cronin and McCarthy became close friends while serving in the Marines during World War II and maintained their friendship after the war. McCarthy testified that between 1958 and 1963, he acquired or caused to be acquired ownership interests in parcels of property and lots located in the Westmoreland subdivision of Skokie, Illinois.

On December 21, 1959, McCarthy entered into an agreement with Cronin, Philip Corboy and Ralph Bogan regarding the purchase of six such lots. The agreement provided that Cronin, Corboy and Bogan would purchase the six lots, with Bogan paying 50%, Cronin and Corboy paying 25% each, and with the purchasers bearing their respective costs, interests or income resulting from the agreement. The lots would then be conveyed to trust No. 1151 at the First National Bank and Trust Company of Evanston, Illinois, of which McCarthy was the beneficiary. The December 21, 1959, agreement indicated that 12 lots had already been conveyed to trust No. 1151 and that it was anticipated that three other lots would be acquired by McCarthy and conveyed to the trust or McCarthy would enter into agreements with the lot owners for the use of the lots in conjunction with the trust. The agreement also indicated that the six lots to be purchased by Cronin, Corboy and Brogan represented 33.037583% of the total front feet of the 22 lots to be held or used in conjunction with the trust.

The agreement further stated:

"It is anticipated by the parties to this agreement that they, and possibly others, will construct an income producing improvement on this property. If it is decided to so improve the property [McCarthy] may purchase not more than 50% of [the other] parties' interest in Lots 12, 16, 21, 22, 28 and 32 by paying each of them the same fractional part of their total costs and expenses in said property, as [McCarthy] is buying, not to exceed 50%, plus 6% per

annum on said fractional part of their cost commencing from the time the cost was incurred."

In addition, the agreement provided that McCarthy would purchase the interest of any party who elected not to participate in an improvement of the property. McCarthy testified that this was a "temporary" or "bridge" agreement.

Pursuant to this agreement, Cronin and Corboy paid 25% of the cost of acquiring the six lots, which would amount to 8.2594% interest in the entire tract. Bogan paid the remaining 50% of the cost of acquiring the six lots, which would amount to a 16.5188% interest in the entire tract.

In late 1960, the parties agreed to improve the property with an office building; the plans called for a three-story building, with an infrastructure that would allow for a possible expansion to five floors. Cronin testified that in February 1961, he telephoned McCarthy to indicate that he and Corboy were concerned that they had nothing to indicate their interest in the venture. According to Cronin, McCarthy responded that he was unable to determine Cronin's exact interest at that time. Cronin testified that he made a similar telephone call in September 1961, during which McCarthy indicated that he had not yet acquired all of the lots and did not know whether all of the lots were necessary. According to Cronin, McCarthy added that the percentage interests of the parties would change if some of the lots were not needed.

During 1961, development of the building proceeded. McCarthy acquired most of the lots discussed in the 1959 agreement. McCarthy obtained a building permit and broke ground on the project by April 11, 1961. McCarthy testified that he negotiated bids for construction with contractors and arranged for payment of contractors' and architects' fees before obtaining a construction loan secured by assets of the participants in late 1961.

According to McCarthy, before the building was completed, Bogan indicated that he wanted out of the investment. Cronin testified that in September 1961, McCarthy suggested that he, Cronin and Corboy purchase Bogan's interest. McCarthy testified that on September 22, 1961, he, Cronin and Corboy agreed to expand the building by $2^1/2$ floors. On November 2, 1961, the parties entered into an agreement which indicated that McCarthy would exercise his option under the 1959 agreement to purchase half of Bogan's interest and Cronin and Corboy would purchase the remainder of Bogan's interest. As Bogan held a 16.5188% interest in the entire tract, it would appear that McCarthy gained an additional 8.25% interest and Cronin and Corboy each gained an additional 4.125% interest from this transaction.

Tenants began occupying the building in February 1962, although the building was not completed until September or October 1962.

Cronin testified that he contacted McCarthy in June 1962, demanding payment for legal services he performed for McCarthy between 1958 and 1962. Cronin testified that he represented McCarthy in transactions involving approximately 100 parcels of real estate and in a suit brought by McCarthy's former attorney. Cronin introduced a group of exhibits at trial providing partial documentation of his work. McCarthy, while testifying that he generally hired attorneys to clear title to lots he acquired, denied that he owed Cronin legal fees and testified that Cronin had merely acted as a "courier."

On October 8, 1962, Corboy sent a letter to McCarthy suggesting that title be formalized by November 1, 1962. Cronin testified that he then received a telephone call from McCarthy, in which McCarthy reiterated that he had not yet acquired all of the lots and did not know whether all of the lots were necessary, which would affect the calculations. On November 3, 1962, McCarthy sent Cronin a letter asking for an additional equity contribution and indicating that McCarthy hoped to determine Cronin's exact interest within the next week so that assignments could be ready by December 1, 1962. Cronin testified that he telephoned McCarthy after receiving this letter. Cronin testified that he told McCarthy that Cronin and Corboy must have their interests determined and spread of record before they would contribute additional equity to the venture. Cronin also testified that he told McCarthy that the question of Cronin's legal fees must be resolved.

Cronin and McCarthy agree that McCarthy telephoned Cronin on November 28, 1962. The parties disagree, however, regarding the substance of the conversation.

McCarthy testified that the purpose of the telephone call was to firm up Cronin's and Corboy's interests in the venture. McCarthy testified that he told Cronin that he wanted to give Cronin calculations that McCarthy had made the previous night. McCarthy testified that he asked Cronin to write the figures down and that Cronin said he was doing so.

According to McCarthy, he calculated that if he exercised his option under the 1959 agreement to purchase half of Cronin's 8.25% interest, Cronin would receive $6,300 and be left with a 4.125% interest. However, McCarthy had also calculated that a 1% interest in the venture was worth $7,000. McCarthy testified that he offered Cronin the choice of accepting either $6,300 or a rebate of 1% in exchange for McCarthy's exercise of his option. According to McCarthy, Cronin elected to retain the 1% interest in lieu of $6,300.

McCarthy also testified that he told Cronin that he did not want to offer the same deal to Corboy, adding that he was considering charging Corboy $40,000 for his services in launching the venture. McCarthy indicated that he would offer Corboy $6,300 in exercising the option, leaving Corboy with an 8.25% interest. Alternatively, McCarthy would subtract 8.25% of $40,000—$3,300—from the $6,300, and pay Corboy $3,000 for half of Corboy's interest. McCarthy added that he would be willing to award a .5% percent interest in lieu of the $3,000, giving Corboy an 8.75% interest in the venture. According to McCarthy, Cronin said he would discuss the matter with Corboy.

In contrast, Cronin testified that the purpose of the call was to settle the question of Cronin's legal fees. Cronin testified that McCarthy agreed to award Cronin an additional 2% interest in the venture in settlement of the dispute. Cronin stated that he wanted one of the additional points to be awarded to Corboy, so that he and Corboy would maintain identical percentage interests in the venture. According to Cronin, McCarthy reluctantly agreed to this arrangement.

Both parties have notes relating to this conversation; McCarthy's notes and a photocopy of Cronin's notes were introduced as exhibits at trial and appear in the record on appeal.

McCarthy was questioned about two letters he wrote to Cronin's attorney in 1986, both of which were introduced into evidence. The first of these, dated October 6, 1986, discusses McCarthy's exercise of his option against Bogan, Corboy and Cronin:

> There is a provision that McCarthy could acquire 50% of each of the first parties [sic] interest. McCarthy exercised this right, reducing Bogan to 8.25% and Corboy and Cronin to 4.125% each. In Corboy's and Cronin's cases McCarthy gave each of them a 1% interest in lieu of payment for the 4.125%, thereby increasing Corboy and Cronin to a 5.125% interest.
>
> In November 1961 (see Bogan letter of November 2, 1961) Corboy and Cronin each purchased one half of Bogan's remaining 8.25% interest, or 4.125% each for Corboy and Cronin. This raised their interests to 9.25% each, which is where they subsequently remained."

At trial, McCarthy indicated that Corboy and Cronin never had a 5.125% interest.

These letters were also used as a basis for questioning a letter McCarthy sent to Corboy on March 25, 1963, indicating that Corboy had an 8.2594% interest and requesting an estimated equity payment of $10,234.25. McCarthy also sent a letter to Cronin indicating that Cronin had a 9.2594% interest and requesting an estimated equity

payment of $11,574.25. Corboy wrote a letter dated March 26, 1963, asking how his interest was calculated and indicating that he understood his interest to be closer to 13%. Cronin initially testified that he never questioned the calculation of his interest, but later testified that he telephoned McCarthy during this time period, requesting a meeting for further explanation of how the interests were calculated. Cronin also testified that he reminded McCarthy that Corboy was supposed to be awarded an additional percentage point in settlement of the legal fee dispute. McCarthy testified that his calculation of Corboy's interest in the March 25, 1963, letter was incorrect and that Corboy's interest on that date was 12.375% because McCarthy had not exercised his option regarding Corboy's interest at that time.

Corboy testified that he met with Cronin and McCarthy in March or April of 1963. Corboy indicated that the meeting was called due to his concern about developmental costs and fees that McCarthy wanted to charge the venture. Corboy testified that they also discussed memorializing his and Cronin's interests in the venture. Corboy also testified that the question of Cronin's legal fees was discussed. Corboy indicated that he and Cronin had agreed at the outset of the venture that they should receive identical interests in the venture. Corboy testified that he believed that he and Cronin were each awarded an additional 1% interest in the venture in return for Cronin's legal services. Corboy stated that there was no mention of the word "option" at that meeting or any other meeting.

In April 1963, McCarthy filed the initial partnership tax return for the Westmoreland Building. McCarthy noted on the return that Cronin and Corboy each had a 9.2594% interest. McCarthy sent copies of the return, along with financial statements prepared by Wolf & Company, to Cronin and Corboy.

McCarthy sent letters to Cronin and Corboy dated May 27, 1963. These letters indicated that the recipient had a 9.2594% interest and requested an additional equity contribution from each recipient. On August 15, 1963, Cronin sent McCarthy a letter that stated in part as follows:

> "With reference to your letter of May 27, 1963, enclosed you will find my check in the amount of $13,889.10. This sum represents my equity payment on the subject building.

> Will you please have the First National Bank & Trust Company of Evanston confirm the assignment of .092594 per cent /interest/ to me in Trust No. 1151. In addition, would you please provide me with a copy of the Trust Agreement."

On August 16, 1963, Cronin sent McCarthy a letter correcting the

August 15, 1963, letter such that the assignment should be 9.2594 percent.

McCarthy and Cronin both signed a letter dated August 19, 1963, from McCarthy to Cronin that states in part as follows:

> "Thank you for your check in the amount of $13,889.10, representing your contribution to your equity of 9.2594 per cent in Trust #·1151 of First National Bank of Evanston.
>
> In the event that additional equity funds are needed you will be billed by the Building for 9.2594 per cent of such equity requirements, and you agree to pay said amount upon request. In the event payment is not made by you after billing, you hereby authorize the Building to deduct from your periodic distributions an amount equal to your share of the additional equity cost plus six per cent per annum thereon for the period this amount remains unpaid."

The letter is signed by McCarthy as the author of the letter and is signed as "Accepted" by Cronin on May 27, 1963.

The Westmoreland Building was ultimately expanded from three to six stories in 1964. Corboy wrote McCarthy in July 1966, requesting a certified audit of the venture. McCarthy testified that the Thomas Havey Company, certified public accountants, reviewed the financial records of the partnership through August 31, 1966, on behalf of Cronin and Corboy. McCarthy also testified, however, that a certified audit of the partnership had never been performed by an independent auditor.

McCarthy also testified that he temporarily used surplus annual partnership funds in a real estate venture, a cattle operation and a construction company. McCarthy testified that he did not always pay the partnership interest on such withdrawals. McCarthy further testified that in one or two cases, he returned the withdrawn funds on or about the end of the year and reborrowed funds after the beginning of the following year.

After closing argument, on June 30, 1992, the trial court sent a letter to the parties. This letter stated in relevant part as follows:

> "After studying my notes and the evidence submitted, I am unable to determine with any degree of certainty whether or not Mr. McCarthy exercised his option against Mr. Cronin. If there is any additional evidence as to this issue, I would appreciate it being submitted to the court.
>
> As it stands, I cannot make a satisfactory ruling on this case."

The parties then submitted a number of letters to the trial court. The parties' letters made additional legal argument and referred to evidence submitted at trial, but neither side submitted additional evidence.

The trial court filed a memorandum of opinion on October 23, 1992. In the memorandum, the trial court indicated that the parties' intent was to be governed by the plain language of the 1959 agreement, the 1961 agreement acquiring Bogan's interest, and the August 19, 1963, letter in which Cronin accepted (on August 27, 1963) a 9.2594% interest in trust No. 1151. The trial court indicated that the agreements were not modifiable due to the alleged fraudulent conduct of McCarthy, finding that there was no evidence of such conduct. The memorandum implies, but does not expressly state, that McCarthy exercised his option against Cronin:

> "Cronin further contends that McCarthy failed to exercise his option as against Cronin. However, according to McCarthy, the original 8.25% interest held by Cronin was reduced by 50% to 4.125% upon the exercise of the option. In lieu of payment for the 4.125%, McCarthy gave Cronin and Corboy a 1% interest which increased the total to 5.125%. In November 1961, Cronin and Corboy each purchased one half of Bogan's remaining 8.25% interest or 4.125% each which raised their total interest to 9.25% each. (Cronin Exhibit 20.)"

Cronin exhibit 20 is the October 1986 letter from McCarthy to Cronin's attorney. The trial court also found that "McCarthy has sustained his burden of proof." Finally, the trial court concluded that an accounting would serve no purpose because there was no basis for increasing Cronin's share of the partnership.

On November 9, 1992, the trial court entered a judgment order in favor of McCarthy. Cronin then timely filed a notice of appeal to this court.

## I

Cronin raises a number of objections on appeal, most of which attack the trial court's reliance on Cronin exhibit 20 for its finding that McCarthy exercised his option. We initially note the standard of review applicable in this case. It is the judgment of the trial court, and not what else may have been said by the trial court, that is on appeal to a court of review. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.) This court cannot disturb the judgment of the trial court following a bench trial where it has resolved conflicting evidence unless an opposite conclusion is clearly evident. (*Schackleton v. Federal Signal Corp.* (1989), 196 Ill. App. 3d 437, 444-45, 554 N.E.2d 244, 249.) Moreover, this court may affirm the judgment upon any ground warranted, regardless of whether it was relied on by the trial court and regardless of whether the reasons given by the trial court are correct. (See *Material Service Corp.*, 98 Ill. 2d at 387, 457 N.E.2d at 12.) The findings and judgment

of a trial court sitting without a jury will not be disturbed if there is any record evidence to support the findings. (*Cotter v. Parrish* (1988), 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176.) Given these standards, we turn to address Cronin's arguments on appeal.

## II

Cronin objects to the trial court's determination that the initial 1959 agreement, the 1961 agreement purchasing Bogan's interest, and the August 19, 1963, letter offering Cronin a 9.2495% interest in trust No. 1151 (accepted by Cronin on August 27, 1963) are unambiguous and controlling in this case. Cronin argues that this determination is against the manifest weight of the evidence.

■ This argument is misplaced. It is well established that the determination of whether a contract is ambiguous is a question of law, not a question of fact. (See, *e.g.*, *Borys v. Rudd* (1990), 207 Ill. App. 3d 610, 617, 566 N.E.2d 310, 314.) Moreover, Cronin does not dispute that there was a partnership agreement in this case; he merely claims it was an oral agreement.

However, even if the agreement was written, Cronin correctly notes that the parol evidence rule, which generally excludes evidence of prior understandings where the parties put their agreement in writing, does not preclude allegations of fraud, such as those Cronin made in this case. (See, *e.g.*, *Farm Credit Bank v. Isringhausen* (1991), 210 Ill. App. 3d 724, 728, 569 N.E.2d 235, 237-38.) Cronin claims that McCarthy intentionally or negligently miscalculated Cronin's interest. Consequently, we turn to consider the substance of Cronin's objections to the trial court's rulings on those claims.

## III

Cronin contends that the trial court improperly applied the burden of proof in this case. Implicit in a partnership agreement is a fiduciary duty between partners to act in the best interests of the partnership. (See *Couri v. Couri* (1983), 95 Ill. 2d 91, 98, 447 N.E.2d 334, 337.) Where one party is the senior or managing partner, his obligation to deal fairly and openly and disclose completely is heightened. (*Saballus v. Timke* (1983), 122 Ill. App. 3d 109, 117-18, 460 N.E.2d 755, 760.) When there is a question of breach of fiduciary duty of a managing partner, such partner has the burden of proving his innocence. *Saballus*, 122 Ill. App. 3d at 117-18, 460 N.E.2d at 760.

■ The burden of the managing partner in such an instance is to show by clear, convincing, unequivocal and unmistakable evidence that he or she has been completely frank and honest with his or her partner. (*Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 81, 115 N.E.2d 323,

328.) Similarly, a managing partner must rebut by clear and convincing evidence the presumption of fraud that arises where the managing partner has enjoyed a benefit. (*Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 305, 120 N.E.2d 546, 553.) However, clear and convincing evidence or testimony is not synonymous with uncontradicted, unimpeached, crystal clear or perfect testimony. (*People v. Monk* (1988), 174 Ill. App. 3d 528, 538, 528 N.E.2d 1063, 1069.) The spectrum of increasing degrees of proof, from preponderance of the evidence, to clear and convincing evidence, to evidence beyond a reasonable doubt, would be clearer if the degrees of proof were defined, respectively, as probably true, highly probably true, and almost certainly true. *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 13-14, 398 N.E.2d 198, 203.

■ In this case, it is undisputed that McCarthy was the managing partner of the Westmoreland Building partnership. Cronin claims that the trial court improperly shifted the burden of proof to Cronin. However, the trial court's memorandum of opinion expressly states that "McCarthy has sustained his burden of proof" regarding the claim that he miscalculated Cronin's interest. Thus, it would appear that the trial court recognized that the burden of proof was on McCarthy.

■ Cronin nevertheless claims that the trial court could not find that McCarthy sustained his burden, given that the parties submitted no additional evidence in response to the trial court's June 30, 1992, letter, which indicated that the trial court could not determine with any certainty whether McCarthy had exercised his option against Cronin. However, as noted above, it is the judgment, not the memorandum of opinion or correspondence, which is on appeal. That the trier of fact may have initially believed that it did not have evidence sufficient to make a particular finding of fact does not preclude the trier of fact from revisiting the record and the applicable law before making a final determination and concluding that there was sufficient evidence to make a finding.

■ Cronin claims that the October 1986 letter from McCarthy to Cronin's counsel, which the trial court's memorandum of opinion cites in discussing McCarthy's exercise of the option, contradicts and impeaches McCarthy's testimony regarding the exercise of his option. However, Cronin's examination of McCarthy indicates that McCarthy did not view his letters as inconsistent with his testimony. Moreover, while the October 1986 letter appears to imply that the options were exercised in 1961, which would be inconsistent with McCarthy's testimony, a review of the 1986 letters reveals that they do not discuss a specific timeline in which McCarthy exercised his options. In addition, as noted above, evidence need not be uncontradicted or unimpeached to be clear and convincing.

Moreover, assuming *arguendo* that it was improper for the trial court to rely on the October 1986 letter, this court may affirm the trial court's finding that McCarthy exercised his option against Cronin if other record evidence supports that finding. In this case, quite aside from the 1986 letters, the record contains Cronin's notes of the November 28, 1962, telephone conversation between McCarthy and Cronin, which state (aside from calculations in the margin) as follows:

```
"11/28/62 - McCarthy
     33.037583%       B-C-C
     McCarthy exercise option        6300
               .04129698%
     Corboy - 8 1/4%       6300
                          -3300  -----> 40 m services
                           3000


                                   1%=7m - 3 story-
                                          subject to mtg
                      .0412968
                      .0412968
                      .00490604    3000 will buy other 1/2 %
                      .0875 Total

     Cronin -   .0412968
                .0412968
                .00990604
                .0925 % -

6250 - 1%"
```

Cronin testified that the numbers listed above supported his characterization of the November 28, 1962, telephone conversation. Cronin testified that the notation "McCarthy exercise option" refers to the option against Bogan's interest. This testimony does not explain the calculation of Cronin's interest at 9.25% near the bottom of the page. Cronin testified that the numbers used to make the calculation of his interest in his notes do not add up. The numbers quoted above do not add up to .0925; they do, however, add up to .09249964, a figure closer to 9.25% than the interest claimed by Cronin. Cronin testified that his notes referred to the settlement of his legal fees insofar as he and McCarthy agreed on a fee amount of $12,500 and the "6250—1%" notation at the bottom of the page supports his claim that he was awarded two percentage points in lieu

of cash for the fees. Cronin's notes, however, contain no notation or calculation of $12,500 (including certain calculations in the margin).

Moreover, Corboy testified that he met with Cronin and McCarthy in March or April of 1963 due to his concern about developmental costs and fees that McCarthy wanted to charge the venture. Though Corboy also testified that legal fees were discussed at the meeting and the word "option" was not mentioned, his testimony regarding the reason for calling the meeting tends to corroborate McCarthy's characterization of the November 28, 1962, telephone call. Regardless of which particular pieces of evidence it may have expressly cited in its opinion, in finding that McCarthy sustained his burden of proof, the trial court concluded from the record that it was highly probable that McCarthy fully informed Cronin of how his interest was determined, including the fact of the exercise of the option. Given the entire record on appeal, we conclude that the trial court's judgment on this issue is not against the manifest weight of the evidence.

## IV

■ Cronin next contends that McCarthy could not or did not legally exercise the option against Cronin for three reasons. First, relying on *Martin v. Prairie Rod & Gun Club* (1976), 39 Ill. App. 3d 33, 348 N.E.2d 306, defendant argues that an instrument (such as the 1959 agreement) that grants an option without a specific time limitation for its exercise violates the common law rule against perpetuities and is therefore void *ab initio*. However, this court distinguished *Martin* in *Marcy v. Markiewicz* (1992), 233 Ill. App. 3d 801, 810, 599 N.E.2d 1051, 1057, noting that the agreement in *Martin* specifically allowed the right of first refusal to pass to a party's heirs. In this case, as in *Marcy*, the right is personal, terminates on the death of a party to the agreement, and does not violate the rule against perpetuities. *Marcy*, 233 Ill. App. 3d at 810, 599 N.E.2d at 1057; see *Vogel v. Melish* (1964), 31 Ill. 2d 620, 624-27, 203 N.E.2d 411, 413-14.

Second, Cronin contends that the option was not properly exercised, because McCarthy did not pay Cronin money under the terms of the 1959 agreement. Generally, the acceptance of an option must not vary from the offer. (See *Seaberg v. American National Bank & Trust Co.* (1976), 35 Ill. App. 3d 1065, 1073, 342 N.E.2d 751, 757.) However, Illinois law permits parties to an agreement to orally modify its terms. (See *A.W. Wendell & Sons, Inc. v. Qazi* (1993), 254 Ill. App. 3d 97, 105, 626 N.E.2d 280, 287.) In this case, the trial court apparently concluded that McCarthy and Cronin agreed to a

modification of the 1959 agreement, pursuant to which McCarthy allowed Cronin to retain an additional percentage point of the project. Given the record on appeal, this conclusion does not appear to be against the manifest weight of the evidence.

Third, Cronin argues that McCarthy could not exercise the option against him because it was part of the 1959 agreement, which Cronin claims is an agreement distinct from the agreement to form the Westmoreland Building partnership. However, this argument does not aid Cronin's case. Assuming *arguendo* that the Westmoreland Building partnership agreement is distinct from the 1959 agreement, and that the option described therein terminated due to the buyout of Bogan's interest or some other dissolution of a partnership at will, it would become far less clear that McCarthy's alleged miscalculation would have occurred during the course of a partnership where McCarthy was the dominant partner. It would become more likely that the alleged miscalculation occurred in the course of forming the new partnership. Accordingly, it would become far less clear that the burden would shift to McCarthy to prove his innocence.

Moreover, if the Westmoreland Building partnership agreement were completely distinct from the 1959 agreement, it would become far less clear that Cronin's interest in the former should be based on an interest created under the latter. The record on appeal shows that the Westmoreland Building partnership was a relatively complex arrangement that involved the contribution of property, capital and perhaps services by the partners. Cronin has cited no authority for the proposition that a partner's interest in a partnership is to be solely determined by his or her interest in property acquired in a prior partnership. In short, if Cronin is correct in asserting that the Westmoreland Building Partnership is distinct from the partnership formed by the 1959 agreement, the letters later signed by the parties assigning Cronin a 9.25% interest and Cronin's testimony that he understood this to be the assignment of his interest in the Westmoreland Building partnership would provide ample support for the trial court's decision, regardless of the November 28, 1962, telephone conversation or McCarthy's 1986 letters.

## V

Finally, Cronin contends that the trial court erred in failing to order an accounting. The Uniform Partnership Act (805 ILCS 205/1 *et seq.* (West 1992)) (Act) requires that a partner render true and full information of all things affecting the partnership on the demand of another partner. (805 ILCS 205/20 (West 1992).) The Act also requires a partner to account to the partnership for any benefit, and hold as

trustee for it any profit derived from use of partnership property without the consent of the other partners. (805 ILCS 205/21(1) (West 1992).) A partner also shall have the right to a formal accounting whenever circumstances render it just and reasonable. (805 ILCS 205/22(d) (West 1992).) Nevertheless, the decision to order an equitable accounting generally rests within the discretion of the trial court and will not be disturbed unless the trial court abused its discretion. See *Sharps v. Stein* (1980), 90 Ill. App. 3d 435, 441, 413 N.E.2d 75, 80.

In this case, the trial court indicated that an accounting would serve no purpose because there was no basis to increase Cronin's interest in the partnership. However, this rationale overlooks Cronin's allegations that McCarthy improperly used partnership funds for McCarthy's other business ventures. At trial, McCarthy testified that he: temporarily used surplus annual partnership funds in a real estate venture, a cattle operation and a construction company; did not always pay the partnership interest on such withdrawals; and in one or two cases, returned the withdrawn funds on or about the end of the year and reborrowed funds after the beginning of the following year. This testimony would appear to support Cronin's claim for an accounting pursuant to sections 21 and 22 of the Act.

Nevertheless, as noted earlier, the judgment of the trial court may be sustained upon any ground appearing in the record, regardless of whether the reasoning of the trial court was correct. Generally, an action for an accounting cannot be brought unless the partnership has been dissolved or a joint action for dissolution and accounting is brought. (See *Couri*, 95 Ill. 2d at 100, 447 N.E.2d at 338; *Hildebrand v. Topping* (1992), 240 Ill. App. 3d 104, 109, 608 N.E.2d 119, 123.) Moreover, a partner cannot maintain an action against a copartner for an accounting as to particular items or transactions. (*Hildebrand*, 240 Ill. App. 3d at 109, 608 N.E.2d at 123.) Unlike the cases relied upon by Cronin, the Westmoreland Building partnership had not been dissolved when plaintiff filed his claim and plaintiff's first amended countercomplaint does not seek dissolution. Indeed, the remedies expressly sought by plaintiff in the first amended countercomplaint seem to indicate that plaintiff wants the venture to continue. Consequently, the trial court did not abuse its discretion in declining to order an accounting.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.