JOEL LABOVITZ *et al.*, Plaintiffs-Appellants, v. CHARLES F. DOLAN *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—88—1942

Opinion filed September 26, 1989.

Jay A. Canel and Peter M. King, both of Jay A. Canel, P.C., of Chicago, for appellants.

Jerrold E. Salzman, Raymond J. Mengler, and Daniel J. Lesser, all of Freeman, Freeman & Salzman, P.C., of Chicago, for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

We have for decision in this case the issue, as posited by the plaintiffs, of whether management discretion granted solely and exclusively to a general partner in a limited partnership agreement authorizes the general partner to use economic coercion to cause his limited partner investors to sell their interests to him at a bargain price.

Plaintiffs as limited partners invested over $12 million in a cablevision programming limited partnership sponsored and syndicated by defendant general partner Dolan. In 1985, the partnership reported earnings of over $34 million and in 1986, it had earnings of just under $18 million as a result of which each of the limited partners was required to report his *pro rata* share thereof on his personal income tax returns for those years. Plaintiffs claim that although the partnership

had cash available to fund the limited partners' tax obligations, Dolan elected to make only a nominal distribution of cash to cover such liability; accordingly, in 1985 and in 1986 the limited partners were required to pay taxes almost entirely from their own funds on income retained by the partnership. In late November of 1986 an affiliate owned and controlled by Dolan offered to buy out the interests of the limited partners for approximately two-thirds of their book value. Over 90% of the limited partners accepted the offer, but simultaneously filed suit claiming Dolan's tactics to be a breach of his fiduciary duty to them. The circuit court dismissed plaintiffs' complaint with prejudice pursuant to section 2—619(a)(9) of our Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(9)), holding that Dolan's acts were within the broad discretion granted him under the terms of the partnership agreement. Plaintiffs appeal from that ruling.

The limited partnership in this case, Cablevision Programming Investments (CPI), was organized for the purpose of investing in entities that produce and acquire programming for marketing and distribution to cable and other pay television services. Dolan and the Dolan owned and controlled Communications Management Corporation of Delaware (CMC) were the general partners in this venture. In 1980, CPI sold 85 limited partnership units at a per unit price of $200,000; plaintiffs purchased 62.4595 of those units for a collective price of $12,491,900 and constituted 73% of all investors. The 263-page "Private Placement Memorandum" (PPM) explained that the proceeds of the CPI offering would be used to purchase 100% of the class A limited partnership interests in another entity (Rainbow) that was organized for the same purpose as CPI; that Rainbow would fund subsidiary partnerships that would produce a variety of programming for distribution to cable TV systems and would have the same general partners as CPI; and that Rainbow would fund another Dolan-controlled entity, Rainbow Programming Services Company, which would distribute "affiliated and unaffiliated cable programming."

The PPM also advised investors that their rights and obligations "are governed by the Articles of Limited Partnership" (the Articles), which were bound as an exhibit to the PPM, and added, in a section entitled "Projected results of Operations of Cablevision Programming Investments," that:

> "The Partnership, Cablevision and its affiliates' intended policy is to make cash distributions to partners each year in an amount approximating the amount of taxable income reflected each year, after providing for adequate working capital require-

ments deemed necessary by the General Partners. Although the projections assume that this policy can be followed in the future, there are significant contingencies relating to many factors which, from time to time, may prohibit any distributions, including, but not limited to cash, cash availability, general working capital requirements, lending restrictions and revised costs and capital requirements."

The Articles provided that Dolan will have "full responsibility and exclusive and complete discretion in the management and control of the business and affairs of the partnership"; that "Dolan in his sole discretion shall determine the availability of Cash Flow for distribution to partners"; that they "contain the entire understanding among the partners and supersede any prior understanding and/or written or oral agreements among them"; and that Dolan would be liable to the limited partners for his willful misconduct but not for "errors in judgment or for any acts or omissions that do not constitute willful misconduct."

CPI limited partnership interests were offered and sold only to "wealthy and sophisticated investors." To qualify for exemption from registration under securities laws, the partnership interests were stated in the PPM to be "suitable only for investors with a net worth in excess of $750,000 (excluding home, furnishings, and automobiles) per unit purchased, and having an anticipated taxable income in 1980, 1981 and 1982 of which a substantial portion would have been taxable in each year for Federal income tax purposes at a rate of 50% or more." Prospective investors were apprised in the PPM, that the "offering and the operations of the entities summarized [therein] are complex," and that a "thorough understanding of such matters is essential in order for prospective investors to evaluate the merits and risks of the offering." In addition, investors were required to represent that they or their representatives were "capable of evaluating the merits and risks of the investment." The offering of 85 units was fully subscribed.

The articles provided also that net profits, net losses and cash flow were to be allocated as follows: Dolan .5%, CMC .5% and limited partners 99%. In 1985, the partnership earned $34,101,000; in 1986 it earned $17,842,000. As noted above, the limited partners were required to pay taxes on these earnings, but Dolan did not distribute cash in an amount sufficient to cover their tax liability. Dolan did, however, lend CPI money to other companies he controlled.

An examination of a limited partner's "K-1" tax forms reveals that from 1980 through 1984, CPI provided no cash to the limited

partners but did afford them some tax benefits. In 1985, each partner was required to report a taxable income of $415,331 per unit, while Dolan distributed only $12,000 per unit; and in 1986, the partners were required to report a taxable income of $216,750 per unit, while again receiving a distribution of only $12,000 per unit.

On November 25, 1986, Cablevision Systems Corporation (CSC), owned and controlled by Dolan, made an offer to purchase all of the CPI limited partnership interests for $271,870 per unit, payable $90,623 in cash and the remainder was to be paid either in 9% notes due on June 30, 1988, and June 30, 1989, or in CSC class A common stock. The offer disclosed that "Dolan and his affiliates would derive substantial benefits in connection with the offer" and that "although the partnership was potentially very valuable *** it was extremely difficult to determine its true value since it was likely that current assumptions would not materialize and that unanticipated events and circumstances would occur." The offer further disclosed that although the partnership had incurred an operating loss of $96,000 per unit in 1986, proceeds from extraordinary and nonrecurring sales of assets would result in sizable taxable income to those limited partners who retained their interests. However, the offer continued, by selling their interests, limited partners would realize not only an added $71,870 per unit in cash profits on their initial investment in addition to the $24,000 previously distributed, but they could also convert their position in 1986 from that of having large taxable income to that of showing a sizable tax loss. This was because, as the offer explained, each limited partner's capital account had been inflated for tax purposes by proceeds from extraordinary and nonrecurring sales to the extent that the book value of a limited partnership interest was shown at $405,000. The "business reasons" given for making the offer were that "the buyout would avoid conflicts since both the operating and the programming entities would be under the same ownership, and would provide a needed source of funds for the development of the programming companies." The articles provided that a limited partner could not sell or otherwise transfer his interest in the partnership without the prior written consent of the general partners. More than 90% of the limited partners elected to accept CSC's offer and sold their interests in CPI to CSC.

On December 1, 1986, plaintiff Joel Labovitz, who had owned three units, filed a class action complaint, but after other former owners joined in his suit as individual plaintiffs, that complaint was withdrawn and this action was substituted.

On April 5, 1988, defendants moved to dismiss plaintiffs' com-

plaint pursuant to section 2—619(a)(9) of the Code of Civil Procedure, and on June 21, 1988, as noted above, the circuit court dismissed the complaint with prejudice. Both parties place heavy reliance upon the documents considered by the trial court and discussed herein, namely, the PPM, the Articles, and defendant's offer to buy the interests of the limited partners. In fact, since plaintiffs omitted attaching copies of these documents to their complaint, which made reference thereto, defendants supplied them in support of their motion to dismiss. (*Perkaus v. Chicago Catholic High School Athletic League* (1986), 140 Ill. App. 3d 127, 488 N.E.2d 623.) In their complaint plaintiffs sought the imposition of "a constructive trust upon the funds held by Dolan, the Partnership and Rainbow which were not required to meet current obligations, to maintain a sound financial position or establish reasonable reserves, and distribute these funds to plaintiffs," and for damages for breach of fiduciary duty. Plaintiffs appeal the order of dismissal, contending that since " 'discretion' can never be exercised in breach of a fiduciary duty," the trial court erred in holding that the PPM and the Articles granted Dolan the discretion to treat his limited partners as he did, without permitting a trial that would inquire into his intent regarding the fairness of the transactions at issue.

In what has become the most celebrated pronouncement characterizing the fiduciary relationship that exists among partners, Chief Judge Benjamin N. Cardozo stated for the court in the case of *Meinhard v. Salmon* (1928), 249 N.Y. 458, 463-64, 164 N.E. 545, 546, that

> "copartners[] owe to one another *** the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [Citation.] Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Judge Cardozo's standard has been adopted by the courts of virtually every American jurisdiction, including our own. Indeed, defendants do not argue otherwise. (*Nelson v. Warnke* (1984), 122 Ill. App. 3d 381,

461 N.E.2d 523.) As between partners, Judge Cardozo went on to hold, "the heavier weight of duty" rests upon him who manages the affairs of the partnership. Accordingly, plaintiffs argue, Dolan, as general partner, owed the limited partners a duty of good faith and loyalty. More specifically, they add, partners owe each other the duty to exercise the highest degree of honesty, fairness and good faith in their dealings with one another and in the handling of partnership assets. (*Couri v. Couri* (1983), 95 Ill. 2d 91, 447 N.E.2d 334; *Mandell v. Centrum Frontier Corp.* (1980), 86 Ill. App. 3d 437, 450, 407 N.E.2d 821.) Plaintiffs complain that the circuit court did not appear to apprehend this duty, but instead, treated Dolan and his limited partners as arm's-length strangers.

Dolan's discretion to withhold cash, plaintiffs assert, was not absolute; it was limited by an implied covenant of good faith and fair dealing implicit in every Illinois contract and by his fiduciary duty to his partners. In Illinois, they aver, such a covenant is implied in every contract absent an express disavowal (*Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 989-90, 466 N.E.2d 958), and that it "has its most natural and common application to the situation where one party exercises discretionary authority in a manner that affects the rights and duties of the other party" (*Rao v. Rao* (7th Cir. 1983), 718 F.2d 219, 223, citing *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30, 421 N.E.2d 1375). "Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Foster Enterprises*, 97 Ill. App. 3d at 30.

Plaintiffs accordingly urge that the manner in which Dolan exercised his discretion must be measured against this "good faith" standard implicit in every Illinois contract. The circuit court, according to plaintiffs, instead of employing this standard, treated the partners not as parties to a contract, but as strangers with no relationship, focusing its holding on a narrow reading of *Nelson v. Warnke* (1984), 122 Ill. App. 3d 381, 461 N.E.2d 523. In *Nelson*, the plaintiff claimed that the general partner breached his fiduciary duty by allowing funds held for distribution to the limited partners to remain in non–interest-bearing accounts. The court held the money to be partnership funds and dismissed Nelson's action because the partnership agreement expressly permitted the general partner to so invest such funds. Plaintiffs reason that in *Nelson*, since the general partner did not personally benefit from his failure to invest funds in interest-bearing accounts, for example, by lending money to himself, his family or

friends at no interest, the court would have reached a different result.

Plaintiffs point out that the PPM provides

"Distributions of Cash Flow of the Partnership and Cablevision will be made at such times and in such amounts as Charles F. Dolan, as the individual General Partner of both partnerships, in his sole discretion shall determine, subject to any restrictions on distributions to partners contained in loan agreements which may be entered into by Cablevision as a condition to its borrowings and which restrictions are not ascertainable at this time.

\* \* \*

The Partnership, Cablevision and its affiliates' intended policy is to make cash distributions to partners each year in an amount approximating the amount of taxable income reflected each year, after providing for adequate working capital requirements deemed necessary by the General Partners."

Thus, plaintiffs argue, Dolan made it clear in the PPM that he intended to distribute cash flow annually when not required to meet current obligations; accordingly, his "discretion" to distribute cash flow was limited by his fiduciary duties to his partners.

Defendants respond that the Articles "unambiguously" support the trial court's conclusion that Dolan had the sole discretion to determine the availability of cash for distribution to the limited partners, pointing to section 7.3 of the Articles, which provides:

"Dolan in his sole discretion shall determine the availability of cash flow for distribution to partners."

Defendants maintain with great insistence that plaintiffs do not and cannot point to any provision in the Articles which expressly or impliedly limited Dolan's discretion to determine whether partnership funds were needed for partnership purposes or could be distributed as cash to the limited partners; instead, defendants interpret plaintiffs argument as being that certain statements contained in the PPM dilute that discretion. However, defendants assert, this argument is seriously impaired by the fact that the Articles, and not the PPM, defined the partners' rights and obligations, pointing to section 15.10 of the Articles, which provides in pertinent part:

"These Articles contain the entire understanding among the partners and supersedes [sic] any prior understandings and/or written or oral agreements among them respecting the within subject matter."

Defendants claim that although the "rights and obligations of the Investors are governed by the Articles." the PPM was merely "in-

tended to furnish information to the proposed investors with respect to the investment described." Thus, defendants contend, the PPM is entirely consistent with the Articles' grant of sole discretion to Dolan to determine how partnership proceeds should be allocated.

Defendants point out that the trial judge, having both the PPM and the Articles before him, held that these documents conferred upon Dolan, as general partner, "the discretion and the decision-making power to decide whether there was adequate working capital required for the operation by this general partner, of this limited partnership, and that he had the right to make revisions of policy and that it was made clear in that document that contingencies could prohibit distribution." In support of his holding the judge specifically relied upon section 7.3 of the Articles, conferring "sole discretion" on Dolan to determine the availability of cash flow for distribution to partners, as well as on section 8.6, providing that the general partner shall not be liable for errors in judgment and that Dolan's liability is to be limited to acts or omissions which amount to willful misconduct. Defendants aver that any fair reading of the PPM must lead to the conclusion, as it did in the trial court, that Dolan neither made a representation nor a binding commitment to distribute cash flow.

Defendants' further response to plaintiffs is that the general partner's specific authority to determine how partnership proceeds should be allocated was not inconsistent with any fiduciary duty owed by Dolan to the plaintiffs, insisting that partners have the right to establish among themselves, by a partnership agreement, their rights, duties and obligations. (*Saballus v. Timke* (1983), 122 Ill. App. 3d 109, 460 N.E.2d 755, citing *Meyer v. Sharp* (1950), 341 Ill. App. 431, 94 N.E.2d 510.) Defendants add that a limited partner who endows a general partner with certain powers to operate the partnership may not later complain that the general partner, by exercising those powers, has breached some fiduciary duty, citing *Nelson v. Warnke*, 122 Ill. App. 3d 381.

In construing a partnership agreement, defendants urge, a court should consider the object, purpose and nature of the agreement (*Estate of McKay v. Moses* (1976), 35 Ill. App. 3d 458, 343 N.E.2d 45), and that the constraints plaintiffs now seek to place on Dolan's sole discretion are antithetical to the nature and purpose of the limited partnership formed in this case, which was designed, they argue, "to offer wealthy and sophisticated investors a unique investment opportunity—access to a family of related entities in an emerging industry, guided by a pioneering and immensely successful talent." Dolan was given, they continue, "the sole discretion to determine whether part-

nership proceeds were needed to fund related entities or could be distributed as cash to the limited partners so that he would have the flexibility needed to meet and anticipate the ever-changing business conditions in the industry," and in deciding how to allocate partnership proceeds, "Dolan was called upon to exercise his business judgment in anticipating future needs, expanding profitable areas and exploring promising new fields." Plaintiffs now attempt, defendants claim, "to second-guess Dolan's business judgment with respect to whether proceeds withheld from distribution were needed for the sound operation of CPI's business affairs and to have the court do likewise."

## OPINION

It is abundantly clear, as defendants point out, that Dolan was granted rather wide latitude in deciding whether or not to distribute cash to the limited partners; the Articles grant him "sole discretion" in the matter and do not mention any distribution for the purpose of meeting the limited partners' tax obligations. Even in the PPM, where distributions of cash approximating the amount of taxable income each year are projected in tabulated form, the language is far from precise and gives the general partner rather liberal discretionary powers as to such distribution.

■ It is also clear, however, that despite having such broad discretion, Dolan still owed his limited partners a fiduciary duty, which necessarily encompasses the duty of exercising good faith, honesty, and fairness in his dealings with them and the funds of the partnership. (See *Couri*, 95 Ill. 2d 91, 447 N.E.2d 334; *Mandell*, 86 Ill. App. 3d 437, 407 N.E.2d 821; *Dayan*, 125 Ill. App. 3d 972, 466 N.E.2d 958; *Foster Enterprises*, 97 Ill. App. 3d 22, 421 N.E.2d 1375.) It is no answer to the claim that plaintiffs make in this case that partners have the right to establish among themselves their rights, duties and obligations, as though the exercise of that right releases, waives or delimits, somehow, the high fiduciary duty owed to them by the general partner—a gloss we do not find anywhere in our law. On the contrary, the fiduciary duty exists concurrently with the obligations set forth in the partnership agreement whether or not expressed therein. Indeed, at least one of the authorities relied upon by defendants is clear that although "partners are free to vary many aspects of their relationship *inter se*, they are not free to destroy its fiduciary character." *Saballus*, 122 Ill. App. 3d at 116.

■ ■ Thus, the language in the Articles standing alone does not deprive plaintiffs of the trial they seek against Dolan for breach of fi-

duciary duty. We therefore agree with plaintiffs that the trial court did not give due consideration to Dolan's duty as general partner to exercise the highest degree of honesty and good faith in his handling of partnership assets, and instead treated the parties as arm's-length strangers (*Couri*, 95 Ill. 2d at 98; *Foster Enterprises*, 97 Ill. App. 3d at 29; *Rao*, 718 F.2d at 222-23; *Dayan*, 125 Ill. App. 3d at 989), holding that no inquiry could be made into the fairness of the transactions at issue because of the language in the Articles regarding Dolan's discretion. Yet in any fiduciary relationship, the burden of proof shifts to the fiduciary to show by clear and convincing evidence that a transaction is equitable and just. (*Bandringa v. Bandringa* (1960), 20 Ill. 2d 167, 170 N.E.2d 116; *Schueler v. Blomstrand* (1946), 394 Ill. 600, 69 N.E.2d 328; *Grossberg v. Haffenberg* (1937), 367 Ill. 284, 11 N.E.2d 359.) Indeed, cases cited and relied upon by defendants hold that when there is a question of breach of fiduciary duty of a *managing partner*, all doubts will be resolved against him, and the managing partner has the burden of proving his innocence." (Emphasis added.) *Saballus*, 122 Ill. App. 3d at 117-18, citing *Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 78, 115 N.E.2d 323.

■ Defendants, however, charge that in an attempt to sustain this appeal, plaintiffs advance for the first time a new theory not presented in their pleadings, nor argued below and never ruled upon by the trial court; that in exercising his sole discretion to determine whether partnership income was needed for partnership purposes or was available for case distributions to the limited partners, Dolan did not act in "good faith" because he was motivated by the specific intent of forcing the limited partners to sell their interests.

Defendants err. Plaintiffs' complaint in essence charges that Dolan, as general partner, owed plaintiffs, his limited partners, a fiduciary duty "to distribute available cash flow to his partners in 1983 through 1986," which duty he breached because "he never intended to pay cash flow to the limited partners," thus "forcing or squeezing his limited partners into accepting his below book value offer" to buy out their interests, to their financial damage. The complaint goes on to allege that by Dolan's selling of the 85 limited partnership units at $200,000 per unit, $17 million was realized as capital for the partnership. After deducting $2 million to pay fees to Dolan and to reimburse him for attorney and accounting fees and other costs incurred in the preparation of the PPM, the sum of $15 million remained as the partnership's capital. In addition to the cash flow generated by operations, the partnership and its related entities realized cash as follows: $20 million in 1983 by selling interests in two related entities to a

subsidiary of The Washington Post. In 1985 there was a $31,600,000 gain upon the sale of an interest in a related entity to a subsidiary of CBS, Inc.; plus $50 million when a lawsuit against Ted Turner and MGM was settled. In 1986, approximately $20 million was paid to the partnership by MGM/UA Home Entertainment Group in exchange for a license option agreement, and $3,500,000 in exchange for the termination of a distribution agreement.

In 1985 the partnership showed income of $2,778,000 exclusive of the gain on the sale of assets and after allowing for depreciation of $1,289,000. During 1986 the balance in the partnership cash account increased $11 million, receivables from parties "related" to Dolan and the partnership increased $3,600,000; and long-term notes receivable increased $9 million. For the year ending December 31, 1986, partnership net income was $17,658,000 and working capital increased by $10,220,000. A footnote to the financial statement for the year ended December 31, 1985, discloses that Dolan retained significant amounts of money within the partnership which were loaned to "related parties"; more specifically, that Rainbow had advanced funds to Rainbow Programming Services Company "which, at December 31, 1985 & 1984, amounted to approximately $13,417,000 and $19,139,000 respectively," besides Rainbow's having made a capital contribution of $8,800,000 to RPSC.

We can think of no reason as to why these allegations should not be found to be sufficient to encompass the claim raised on this appeal, and sufficient also to apprise defendants thereof. "No pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he or she is called upon to meet." (Ill. Rev. Stat. 1987, ch. 110, par. 2—612(b).) Moreover, it is well settled that "[p]leadings shall be liberally construed with a view to doing substantial justice between the parties." (*Mlade v. Finley* (1983), 112 Ill. App. 3d 914, 445 N.E.2d 1240; *Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21, 392 N.E.2d 154; Ill. Rev. Stat. 1987, ch. 110, par. 2—603(c).) Plaintiffs' allegation that Dolan, by breaching his fiduciary duty, "squeezed" plaintiffs out, despite its employment of a breezier, more colorful syntax than a simple charge of "willful misconduct," in the precise words of the articles, does not fail, in its context, to comply with the requirement of our Code of Civil Procedure relating to the proper pleading of a cause of action. Although other pleaders may have cast the same issue in different terms, or may have crafted it more artfully, that factor alone should not command a different result. The law has long since outgrown its primitive state of formalism where the precise

word was the sovereign talisman and every slip was fatal. (See *Wood v. Duff-Gordon* (1917), 222 N.Y. 88, 118 N.E. 214.) We further note that the trial judge made it quite clear in his remarks at the hearing on defendants' motion to dismiss that he had no difficulty in apprehending the allegations contained in plaintiffs' complaint or their claim advanced in oral argument that Dolan had breached his fiduciary duty by "failing to distribute cash" and "by using undue influence to have an affiliate offer to buy out those limited partners at a price."

In the alternative, defendants urge that should this court undertake to consider plaintiffs' "new" theory, it still should not inquire into the motivation behind Dolan's exercise of his discretion in allocating partnership funds because plaintiffs do not allege that Dolan acted other than in the manner contemplated by the partnership documents and in furtherance of the partnership's declared purpose, contending that general partners who exercise powers given to them under a partnership agreement do not thereby breach any fiduciary duty, regardless of their motivation, citing *Murphy v. Gutfreund* (S.D.N.Y. 1984), 583 F. Supp. 957, 971. However, we regard this argument as having a timbre no different in resonance from the one we have deposed of above, namely, that partners have the right to establish among themselves their rights and responsibilities. We need not, therefore, give it any further or any different consideration here.

Defendants next assert that the good-faith doctrine protects only the reasonable expectations of the contracting parties (*Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 466 N.E.2d 958), and that a party's legitimate expectations are not violated where there is good cause for a party's exercise of its contractual discretion, regardless of what other motives the acting party may have. (*Corbin on Contracts* §654D, at 664 (Supp. 1984).) In *Dayan*, plaintiff's franchise agreement had been terminated after he violated its terms. Plaintiff contended that the franchisor had terminated him not because he had violated the franchise agreement, but because the franchisor desired to recapture the franchisee's lucrative market for himself. The court ruled that since there was good cause to support the franchisor's exercise of his discretion to terminate the franchise agreement, it would make no further inquiry into the franchisor's motivation.

Defendants here make the same contention: that no inquiry into Dolan's motivation is necessary to protect the reasonable expectations of the limited partners, and more particularly, that plaintiffs could have no reasonable expectation that Dolan would distribute partnership funds to them instead of utilizing such funds to meet partnership needs, pointing out that partnership documents warned prospective

investors that they could lose their entire investment, and that no representation as to the availability of future cash for distribution to the limited partners could be made. Defendants add that the allegation that Dolan breached his fiduciary duty to the limited partners by forcing them to choose between selling their interests at an unfairly low price, or remaining a powerless limited partner depends on whether·or not Dolan promised to distribute cash in the manner in which plaintiffs allege, and since he did not make any such commitment, the allegations of the complaint are undercut and must be dismissed—the very basis upon which the trial court granted defendants' motion to dismiss.

As Professor Daniel S. Reynolds of the Northern Illinois University School of Law states in his article, *Loyalty & Limited Partnership*, 34 U. Kan. L. Rev. 1, 25-26 (1985),

> "Self-dealing and conflicts of interest are endemic to the limited partnership. Limited partnerships 'are born in conflicts of interest, live in conflicts of interest, and sometimes poof out of existence in conflicts of interest.' [Quoting from 16 Sec. Reg. & L. Rep. (BNA) 1559 (1984).] The general partners are typically the organizing entrepreneurs or promoters. They may be affiliated with the sellers of the enterprise's assets, and are frequently involved in multiple, potentially competing related enterprises. This may be good, bad, or indifferent. Categorical prohibitions of conflicting interests might be a coherent response to all this, but a potentially fatal one as well for whatever assumed benefits of flexibility in capital formation the form provides. Categorical permission for conflicting interests might also be a coherent response, but one running all the risks that 'fiduciary ideology' is supposed to prevent. What is desired is a scheme for containing conflicts, a fairness-promoting regime that ensures, to the extent possible, that investors in the limited partnership are not being exploited, overreached, or taken advantage of by the managers of their money."

■ Defendants prevailed in the trial court on their section 2—619(a)(9) motion on the ground that the claim is defeated by affirmative matter, namely, Dolan's sole discretion in the matter of distributing cash flow. As to such affirmative defense, defendants choose to remain completely oblivious to the fact that although the Articles clearly gave the general partner the sole discretion to distribute cash as he deemed appropriate, that discretion was encumbered by a supreme fiduciary duty of fairness, honesty, good faith and loyalty to his partners. Language in an agreement such as a "sole discretion" does

not metamorphose the document into an unrestricted license to engage in self-dealing at the expense of those to whom the managing partner owes such a duty. Defendants cite no authority, and we find none, for the proposition that there can be *a priori* waiver of fiduciary duties in a partnership—be it general or limited. Nor is the practice of imposing purported advance waivers of fiduciary duties in limited partnership enterprises to be given judicial recognition on the basis of the facts developed in this case. Defendants' argument that the good-faith doctrine protects only the reasonable expectations of the contracting parties is, we think, aptly answered by plaintiffs' statement to the trial judge at the hearing on defendants' motion to dismiss: "[t]he risk we took was that the business would not succeed. We did not take the risk that the business would succeed so well that the general partner would squeeze us out and take the investment for himself," an argument, by the way, that sets forth a precise formulation of the exact issue in this case.

■ Our courts are not bound to endow it as doctrine that where the general partner obtains an agreement from his limited partner investors that he is to be the sole arbiter with respect to the flow that the cash of the enterprise takes, and thereby creates conditions favorable to his decision that the business is too good for them and contrives to appropriate it to himself, the articles of partnership constitute an impervious armor against any attack on the transaction short of actual fraud. That is not and cannot be the law. (See *Remillard Brick Co. v. Remillard-Dandini Co.* (1952), 109 Cal. App. 2d 405, 241 P.2d 66.) And that is precisely the gravamen of plaintiffs' complaint: that the general partner refused unreasonably to distribute cash and thereby forced plaintiffs to continually dip into their own resources in order to pay heavy taxes on large earnings in a calculated effort to force them to sell their interests to an entity which Dolan owned and controlled at a price well below at least the book value of those interests. Such a claim plainly presents an issue for the finder of fact, namely, whether or not Dolan was serving his own interests or those of the partnership. Although defendants state in their brief that Dolan allocated the partnership's funds to meet its needs and to serve its purposes, and although in oral argument defendants represented that the partnership was continually short of cash, the record at this stage is totally devoid of any such evidence. To be sure, all of the allegations made by plaintiffs in their complaint and noted above stand, according to the record made in this case, as unrebutted, undenied, unexplained and uncontroverted.

Plaintiffs therefore correctly maintain that they "were entitled to

418

a trial in which Dolan must prove he acted fairly and not as his limited partners' business adversary." Accordingly, we hold that the trial judge incorrectly granted the defendants' section 2—619(a)(9) motion and that plaintiffs were entitled to a trial on the issues formulated in this case.

Reversed and remanded.

BILANDIC, P.J., and HARTMAN, J., concur.