NOTICE
Decision filed 04/09/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190309-U

NO. 5-19-0309

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MARY FRANCES DALTON, Individually, and as Mother and Next Friend of Bosco Dalton; MARY FRANCES DALTON, as Guardian of the Estate and Person of Bosco Dalton, a Disabled Adult, | ) ) ) ) ) | Appeal from the Circuit Court of Marion County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 17-MR-91 |
| RUSSELL DALTON, Individually, and as Co-Trustee of The Bosco Dalton Irrevocable Discretionary Supplemental Care OBRA '93 Trust, | ) ) ) ) | Honorable Jeffrey A. DeLong, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Order awarding plaintiff $1075 in damages, awarding plaintiff $487 in attorney fees, and denying plaintiff's request to remove defendant as custodian of two custodial accounts affirmed where the rulings were not against the manifest weight of the evidence. Denial of interest claim affirmed where same was not an abuse of discretion.

¶ 2    The plaintiff, Mary Frances Dalton (Frankie), appeals the April 15, 2019, order of

the circuit court of Marion County that awarded her $1075 of the $10,865 in damages that

she requested, awarded her $487 of the $8246.50 in attorney fees that she requested, denied

1

her request for interest, and denied her request to remove the defendant, Russell Dalton (Russ), as custodian of two custodial accounts established for the benefit of the parties' two daughters. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4     On June 14, 2017, Frankie filed a two-count complaint in the circuit court. Count I requested that Russ be removed as co-trustee of a trust[1] that was established for the benefit of the parties' disabled son, alleging that Russ expended funds from the trust for his personal use.[2] Count I acknowledged that Russ had reimbursed the trust $18,027.64 after receiving a demand letter but alleged that Russ still owed several unreimbursed expenses to the trust. Attached to the complaint is Exhibit C, entitled "Unapproved Expenditures by Russ Dalton From Bosco Dalton Trust Account." Enumerated on Exhibit C are 32 checks allegedly written by Russ out of the trust, each listed individually and identified by check number, payee, and amount. The checks comprise a total amount of $14,336.14.[3] Accordingly, count I requested that Russ be ordered to repay that amount, plus interest. Count II requested that Russ be removed as custodian of two custodial accounts that were established for the benefit of the parties' two daughters. Attorney fees were also requested.

---

[1]Although count I requests Russ's removal as co-trustee, in her trial brief filed after the trial on March 5, 2019, Frankie indicated that Russ resigned as co-trustee in 2016.

[2]In substance, count I asserts a claim of breach of fiduciary duty, notwithstanding the absence of that particular language in the pleading. See *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 335 (1997) (we consider allegations of complaint that set forth facts to support a cause of action and overlook technical form of complaint).

[3]Notably, this amount in count I differs from the amount requested at the trial, none of the checks at issue at the trial were included in Exhibit C, and none of the checks in Exhibit C were presented at the trial. These facts were noted and emphasized by the circuit court in its order. After the trial and the entry of the circuit court's order, Frankie filed a motion for leave to amend the complaint to conform to the proof only to the extent of the dollar amount sought, which the circuit court granted.

¶ 5    On February 25, 2019, a bench trial was conducted.  At the trial, James Gaston testified that he was currently employed as a union carpenter and previously owned a construction business, Gaston Construction Company, Incorporated (Gaston Construction), which dissolved in 2014.  In March 2011, James submitted a proposal to the parties for Gaston Construction to remodel a bathroom for $7532.72.  The proposal was introduced as Defendant's Exhibit 3 and denoted a down payment in the amount of $3000 paid from Bosco's trust to Gaston Construction by check number 104.

¶ 6    James testified that the remodeling job commenced within 30 days of the proposal and consisted of converting a bathroom to make it handicap-accessible for the parties' disabled son.  James testified that the remodel entailed tearing the bathroom "down to the bare studs," wiring it, replumbing it, installing flooring, walls, a new window, vanity, and fixtures, and widening the doorway.  James indicated that the key component to the bathroom remodel was the installation of a new walk-in bathtub.  He noted that the bathtub was ordered and purchased separately by the parties and was not included in the proposal amount submitted by Gaston Construction.

¶ 7    Defendant's Exhibit 7 was introduced, which James identified as the final invoice which reflected a few added unforeseen expenses involving old plumbing and a leak repair. James testified that he received a total of three payments for the job.  Per the exhibit, in addition to the $3000 down payment, Gaston Construction received a second payment of $3000 paid by check number 106 and a final payment of $2875 paid by check number 109, for a total of $8875 received from Bosco's trust.

3

¶ 8     James testified that he communicated mainly with Russ during the job. He indicated that, when completing and billing for the work, he did not divide the cost of the labor necessary to install the bathtub from the cost of the labor for the walls, flooring, plumbing, and other necessities of the job. Rather, the labor costs for the project were combined and billed as a total on the invoice. James explained that it would be impossible to distinguish between the labor expended to install the bathtub and the labor expended on the other specifics of the job. James testified that he learned that Russ's family received money for the children's college, and because Bosco could not attend college, his money was used to make the bathroom handicap-accessible. James confirmed that the checks received by Gaston Construction were written from the Bosco Dalton Trust.

¶ 9     Frankie testified that she and Russ married in 2000. When they married, she had two sons, Joseph (Joe) and Bosco. She testified that Bosco was born with cerebral palsy, is completely nonverbal, uses a wheelchair, and requires round-the-clock care. Russ adopted Joe and Bosco in 2004. Two daughters who were 16 and 11 years old at the time of the trial were born to the parties during the marriage, Bosco was 27 years old at the time of the trial, and Joe was an adult living on his own.

¶ 10     Frankie testified that in 2010, Bosco inherited funds from Russ's grandmother. Frankie added that Bosco was eligible for certain governmental benefits, including supplemental social security income and a medical card. Frankie indicated that, in order to qualify for the benefits, Bosco was forbidden from owning any assets valued over $2000. Accordingly, a special-needs trust was created in which to deposit the inheritance, thereby allowing Bosco to continue receiving benefits.

4

¶ 11     Joint Exhibit A was introduced, which Frankie identified as a copy of Bosco's trust. Frankie testified that she and Russ were co-trustees of the trust. Frankie understood that there were strict rules governing what the trust funds could be spent on and that Bosco's right to receive benefits could be affected if improper purchases were made. She agreed that Russ was also aware of these rules, as he was present when the trust was established and its terms were discussed. Frankie testified that Russ's brother-in-law set up the trust account, as he was a representative of Charles Schwab. Frankie indicated that she had nothing to do with setting up the account or signing the papers, and she was unaware that a checkbook was involved. Rather, she believed the trust was primarily an investment account.

¶ 12     Frankie testified that she and Russ began renovating their marital home right after they purchased it. She explained that the home was built in 1940 and described it as "a constant money pit of remodeling." Frankie testified that projects in the home included renovating the kitchen, installing a new metal roof, painting, installing drywall, and replacing the windows. She testified that Russ's mother provided money for the new windows and a second mortgage was established to supply the funding to complete the other remodeling projects.

¶ 13     Frankie testified that Bosco underwent spinal surgery in 2010. She recalled a discussion with Russ in 2011 to purchase a bathtub for Bosco to better accommodate his needs and that the bathroom remodel was "a logical next step to getting everything else done." When plans commenced to remodel the bathroom, the parties agreed on the bathtub to purchase for Bosco. Frankie recalled that the bathtub cost approximately $6600 and the

parties agreed that they would use funds from Bosco's trust to purchase it. She reported that there were never any discussions of using any of Bosco's funds to remodel the home prior to the bathroom remodel. She testified that because she was unaware of the existence of a checking account associated with the trust, she was not involved in the receipt or payment of any invoices submitted by Gaston Construction.

¶ 14    Frankie testified that she was the primary breadwinner during most of the marriage while Russ had multiple employers. Frankie reported that at the time of the bathroom remodel, the parties had a joint account into which Frankie deposited her employment bonus, which was used to purchase the vanity, toilet, paint, cabinets, and fixtures for the bathroom. Frankie testified that "Russ said he could take care of the rest of it." Frankie explained that she had assumed that Russ would use a separate business account to pay for the remaining expenses of the remodel. Frankie stated that Russ never mentioned using funds from Bosco's trust to pay for anything besides the bathtub itself and had he made such a suggestion, she would not have agreed to it. She added that there were never any discussions about the balance in Bosco's trust or what had been spent from it.

¶ 15    Frankie testified that she and Russ divorced in 2014. When they separated, Frankie moved into the house next door, and Bosco initially stayed at Russ's home because Frankie's home could not yet accommodate Bosco's needs. Frankie testified that Bosco moved in with her in March 2015 and he had only spent one night with Russ since then. Frankie testified that Russ relinquished co-guardianship of Bosco's person and estate around August 2016. It was then that Frankie accessed the records from Bosco's trust and discovered that Russ had written and signed his name to numerous checks against Bosco's

6

trust. Frankie explained that it took her two years after the divorce to obtain the trust information because it never occurred to her that Russ would have been misappropriating the trust funds for personal expenses.

¶ 16 Joint Exhibit B was introduced, which contained a demand letter from Frankie's counsel addressed to Russ and dated January 20, 2017, along with copies of all the checks written by Russ against Bosco's trust which, per the demand letter, totaled $31,821.14. Frankie testified that some of the checks were payable to Gaston Construction. Other checks were payable to Bosco, who would have been unable to sign or endorse the checks due to his disability. Frankie observed additional checks payable to Flora Country Club and attorney Bill Milner. Also contained in Group Exhibit B were copies of requests for Russ to resign as custodian of the parties' daughters' accounts. Frankie indicated that, to date, Russ had not signed the resignations.

¶ 17 Joint Exhibit C was introduced, which consisted of a response letter from Russ addressed to Frankie's counsel and dated February 1, 2017, along with a copy of the check that was attached to the letter, written from Russ's personal account, and payable to "Bosco Dalton Trust" in the amount of $18,027.64. Russ indicated in the response letter that he was fully responsible for the funds used from Bosco's trust. He alleged, however, that several of the checks denoted in Frankie's demand were legitimate purchases made for Bosco's benefit, with Frankie's knowledge and approval. Russ specified that those approved purchases totaled $17,495 and categorized them as follows: $8875 to Gaston Construction for the bathroom remodel, $6630 for the bathtub, $675 for drywall and paint for Bosco's bedroom, $90 to the Illinois Department of Revenue for taxes paid on Bosco's

7

trust, $1075 for cabinets and countertops for Bosco's bedroom, and $150 for the preparation of 2014 taxes for Bosco.

¶ 18    Russ's letter reflected the total amount of expenditures, as asserted in Frankie's demand letter, and subtracted from that total the amount of the alleged legitimate purchases of $17,495, for a balance of $14,326.14 owed to Bosco's trust.  Russ indicated in the letter that "I am embarrassed and ashamed for my actions and will certainly pay the money owed to Bosco's trust including any proceeds due him."  Russ further asserted in the letter that the parties' daughters' accounts were nonsignatory and the funds therein could not be accessed by anyone other than the daughters after they obtained the age of 21 years.  Accordingly, Russ refused to resign as custodian of those accounts, asserted that Frankie was free to review the accounts online, and reported that he deposited an additional $7500 to each of the accounts.  In the letter's conclusion, Russ explained that the amount of the enclosed check ($18,027.64) consisted of $14,326.14 due to Bosco's trust with $1673.86 added for interest and dividends, as well as $2027.64 from Bosco's "Rep payee account" still being held in Russ's name.  Frankie explained that this was the account in which Bosco's social security income was held.

¶ 19    Frankie testified that she was not satisfied with the amount of Russ's reimbursement.  Plaintiff's Exhibit 1 was introduced, which Frankie identified as a list of checks that Russ failed to reimburse.[4]  Per the exhibit, the amount of these checks was $10,865 and the amount of interest requested was $3998.39, for a total of $14,863.39 that

---

[4]To reiterate, none of these checks were included in the complaint.

Frankie requested Russ to pay. Frankie identified Plaintiff's Exhibit 2 as an affidavit from her counsel with an attached statement reflecting attorney fees of $8246.50, which Frankie requested Russ to pay. Regarding count II of the complaint, Frankie conceded that she reviewed the records of the daughters' accounts and discovered no misappropriations. However, she indicated that she did not trust Russ to unilaterally oversee the accounts. Accordingly, she requested the circuit court to remove Russ as custodian of the accounts and appoint her as the custodian.

¶ 20 Russ testified that he adopted Bosco and Joe and that he and Frankie had two daughters during the marriage. Russ affirmed that when his grandmother passed away, each of the four children inherited $37,620.68. Subsequently, the trust was established for Bosco. Russ testified that he and Frankie were co-trustees of Bosco's trust and that he read the trust and understood the restrictions thereon. Russ testified that he and Frankie both signed the paperwork when the trust was established. He emphasized that Frankie was present when they received the checkbook, but he conceded that she never wrote a check from the trust account.

¶ 21 Russ testified that shortly after the trust was established, he and Frankie discussed using Bosco's funds to remodel the bathroom. Russ indicated that Frankie's testimony to the contrary was "[a]bsolutely not the case, because the entire bathroom had to be completely redone." Russ testified particularly that he and Frankie "discussed remodeling the bathroom, you know, when Bosco's funds showed up. I mean that's *** what they're for. So that's what we used it for." Russ explained that he and Frankie were happily married at the time and their agreement was to remodel the bathroom for Bosco in order to

9

make his place more livable and comfortable.  He added that Frankie wanted the bathroom redone as much as he did because at that time, they were required to carry Bosco up and down the stairs to give him baths.

¶ 22  When questioned why he did not allow Frankie, as co-trustee, to sign off on the expenditures from the trust, Russ replied that "it was a poor assumption on my part."  He explained that the checkbook had only one signature line and he was not aware that he needed Frankie's permission to pay relevant fees and expenses that were directly related to Bosco's care.  Russ added that as he and Frankie discussed it, they did not have the money in their joint account.  He explained that "I knew that we didn't have the money in our own account to pay for it.  That was part of Bosco's money, and we knew it came from Grandma Erma.  And we had agreed we were going to remodel the bathroom, and that's what *** I used it for basically."  Russ testified further that using Bosco's trust for the bathroom "was a foregone conclusion since we did not have the money to pay for [it] ourselves."  Russ added that Frankie oversaw their joint account and he rarely looked at the checkbook on the account.  Russ assumed that if Frankie had the money to pay for the entire bathroom remodel, she would have but "[o]bviously she couldn't have or we wouldn't have used Bosco's money for it."  Russ reiterated that he and Frankie "discussed doing it all" and that "she was part and party to it."

¶ 23  Russ acknowledged that he breached his fiduciary duty as co-trustee by writing checks to himself, to Bosco and forging his name, and to his attorney and that he was embarrassed about what he had done.  Russ testified that he responded promptly to Frankie's demand letter and reimbursed the funds that were used inappropriately, with

10

interest added. Russ acknowledged Frankie's request for him to reimburse the $8875 paid to Gaston Construction. Regarding the extra payment to Gaston Construction for repairing the water leak, Russ explained that the leak was directly from that particular bathroom and Bosco's bathtub could not be installed without the repair.

¶ 24 Russ testified that a check payable to Patrick Hayes for $675 was for drywall in Bosco's bedroom and was separate from the checks payable to Gaston Construction for the bathroom remodel. Additional expenses Russ alleged were legitimate included $150 to Custom Accounting for preparation of Bosco's income taxes and $90 to the Illinois Department of Revenue, all for Bosco's benefit. When questioned about an additional check payable to Rollinson's Home Center in the amount of $1075, Russ replied that he had maintained an open account with Rollinson's because "we were constantly doing updating work to the house." Russ testified: "I think that was for the cabinets we bought for Bosco's room. *** I think there was some drywall mud and some primer that I got from Rollinson's as well." Russ conceded on cross-examination, however, that many purchases were made at Rollinson's over time and he could not say with certainty that the $1075 purchase was for Bosco's benefit.

¶ 25 Russ testified that the parties married on November 17, 2000, purchased the marital home on December 7, 2000, and divorced on August 18, 2014. Pursuant to the parties' marital settlement agreement, Frankie signed a quitclaim deed and Russ was awarded the marital home, where he continued to live. Russ confirmed that Bosco resided with him after the parties' divorce until March 2015. Accordingly, Bosco used the remodeled

11

bathroom and bedroom from the time the renovations were complete in 2011 until he moved out in March 2015.

¶ 26    Pursuant to Plaintiff's Exhibit 1, Russ testified that most of the $10,865 at issue was payable to Gaston Construction. Russ explained that Bosco needed the new bathroom because he had undergone two back surgeries and needed an additional surgery. Russ indicated that before the remodel, apart from bathing and sleeping, Bosco spent all his time downstairs with the family. Bosco was required to be carried up and down the stairs for his baths, which was difficult. Russ testified that a downstairs sunroom was converted into a bedroom for Bosco because it was right next door to the bathroom.

¶ 27    Russ acknowledged that Frankie was seeking his removal as custodian of the daughters' accounts. He testified that no money was ever removed from the accounts. Russ identified Defendant's Exhibits 8 and 9 as statements of the accounts, each reflecting a balance of $75,281.52. Russ acknowledged that the accounts had grown significantly since initial deposits of $20,000 were made into each. Russ testified on cross-examination that he was not aware that he, as the sole custodian of the accounts, could access the funds. The circuit court took the matter under advisement.

¶ 28    On April 15, 2019, the circuit court entered an order, noting that Exhibit C attached to Frankie's complaint itemized unapproved expenditures totaling $14,365.14, which did not include any of the expenditures claimed at the trial, including those to Gaston Construction. The circuit court observed Frankie's testimony that she agreed to the remodel but was unaware of where the funds were coming from. The circuit court further observed that the parties were co-trustees who were married at the time of the remodel and

12

both supported Bosco.  The circuit court found that it would be speculative to attempt to determine the amount of the Gaston Construction bill that was related only to installing the bathtub, as opposed to the expenses related to other portions of the remodel.  The circuit court added that Bosco and both parties benefited from the construction and there was no evidence to indicate that, at the time of the expenditures, the parties and Bosco did not have plans to continue residing in the home and utilizing the improvements.  The circuit court indicated that Russ did not provide a clear answer about the $1075 check to Rollinson's. The circuit court stated that although Russ initially testified the purchase was for cabinets for Bosco, he later admitted that because many purchases were made at Rollinson's, he could not definitively say that the purchase was for Bosco.

¶ 29    The circuit court ordered Russ to reimburse Bosco's trust for check number 114 to Rollinson's for $1075, denied the remaining requested expenses in Plaintiff's Exhibit 1, and denied Frankie's request for interest.  Regarding attorney fees, the circuit court found that Russ initially violated his fiduciary duty to Bosco's trust, that Frankie hired an attorney who prepared the demand letter, and that Russ sent a check reimbursing the trust for what he believed was wrongly spent.  Accordingly, the circuit court ordered Russ to pay Frankie's attorney fees in the amount of $487.50, which represented the fees incurred until Frankie's counsel forwarded Russ's reimbursement check to Frankie.  The circuit court observed that the daughters' accounts were never misused, and the evidence showed that the funds in the accounts had in fact increased.  As such, the court denied Frankie's request to remove Russ as custodian of the accounts but ordered Russ to grant Frankie unlimited access to the records of the accounts.

13

¶ 30    On April 25, 2019, Frankie filed a motion to reconsider and a motion for leave to amend the complaint to conform to the proof only to the extent of amending the amount of requested damages to $10,865.  On July 8, 2019, the circuit court entered an order on the motion to reconsider, indicating that "[t]his matter comes down to determination of credibility."  The circuit court again observed Exhibit C attached to the complaint which set forth all the alleged unapproved expenditures.  The circuit court emphasized that the $8875 to Gaston Construction—that Frankie now alleged was unapproved—was missing from Exhibit C of the complaint.  As such, the circuit court was not convinced that the expenses related to Gaston Construction were unapproved.  The circuit court denied the motion to reconsider and granted the motion to amend the complaint, noting that Frankie sought only to amend the dollar amount to $10,865.  Frankie filed a timely notice of appeal.

¶ 31                                    ANALYSIS

¶ 32    We consider the following issues on appeal: (1) whether the circuit court erred by not awarding Frankie the full amount of damages requested; (2) whether the circuit court erred by denying the claim for interest; (3) whether the circuit court erred by not awarding Frankie the full amount of attorney fees requested; and (4) whether the circuit court erred by not removing Russ as custodian of the parties' daughters' accounts.

¶ 33                             I. Standard of Review

¶ 34    "A reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence."  *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008).  "A judgment is against the manifest weight of the evidence only when an opposite conclusion

14

is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001). "A trial court's judgment following a bench trial will be upheld if there is *any* evidence supporting it." (Emphasis added.) *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 484 (2002).

¶ 35    "As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony." *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. "It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859.

¶ 36                                      II. Damages

¶ 37    In light of the principles set forth in the standard of review, we first consider whether the circuit court erred by not awarding Frankie the full amount of damages she requested. At trial, Frankie requested damages in the amount of $10,865. Of that amount, the circuit court found that one expenditure—check number 114 payable to Rollinson's in the amount of $1075—was a breach of Russ's duty as co-trustee because Russ could not confirm that the purchase was made for Bosco's benefit. Accordingly, the circuit court ordered Russ to repay $1075 and denied the remaining amount of requested damages.

¶ 38    On appeal, Frankie argues that the circuit court erred by not awarding her the full amount of damages requested.  She cites *Stuart v. Continental Illinois National Bank & Trust Co. of Chicago*, in which the supreme court indicated that "[i]t is axiomatic that the limits of a trustee's powers are determined by the instrument which creates the trust [citations] and that a co-trustee cannot exercise a joint power individually [citations]."  68 Ill. 2d 502, 523 (1977).  Section 194 of the Restatement (Second) of Trusts provides: "If there are two or more trustees, the powers conferred upon them can properly be exercised only by all the trustees, unless it is otherwise provided by the terms of the trust."  Restatement (Second) of Trusts § 194 (1959).

¶ 39    In this case, the circuit court correctly observed that the trust instrument in multiple paragraphs speaks of the co-trustees in their sole and absolute discretion and sole and exclusive discretion, but nowhere does the trust instrument require the express consent of both trustees.  Neither does the trust contain language that any powers of the co-trustees may be exercised individually.  Making purchases from the trust is a joint power, as the trust appointed the parties as co-trustees and the instrument provides that "[it] is in the absolute, sole and exclusive discretion of the acting Co-Trustees *** if any payment, any distribution, or any use of the assets of this trust shall be made during BOSCO DALTON's lifetime."  Although an express consent is not required by the trust instrument, it still stands that Russ, as a co-trustee, could not exercise the joint power to make purchases out of the trust individually.  See *id*.  Accordingly, we must determine whether Russ acted unilaterally in making the disputed purchases that the circuit court denied damages for.

16

¶ 40   Frankie argues that Russ made the disputed purchases unilaterally and without her knowledge or consent.  She alleges in her brief that "there is no dispute that [Russ] did not obtain [her] consent as co-trustee for the expenditures complained of."  (Emphasis in original.)  To support this allegation, Frankie references her own testimony in which she emphatically denied that she was aware of or consented to using Bosco's trust funds to pay for anything besides the bathtub, as well as portions of Russ's testimony in which he did not outright indicate that Frankie approved of the disputed expenses.

¶ 41   Our review of the trial transcript reveals *conflicting* testimony on whether Frankie knew of and approved the subject expenses.  Although Frankie testified that Russ did not mention using Bosco's trust to pay for anything besides the bathtub itself, Russ testified that was "[a]bsolutely not the case, because the entire bathroom had to be completely redone."  Russ testified that the parties discussed using Bosco's funds to pay for the remodel when the inheritance money was first received because there were insufficient funds in the parties' joint account to pay for the project.  Russ further testified that he consulted with Frankie because both parties wanted the bathroom redone, they agreed to do it for Bosco's benefit, they discussed doing it all, and Frankie was part and party to it.

¶ 42   While we acknowledge the portions of Russ's testimony cited by Frankie in her brief, we are mindful that even if a witness's testimony contains contradictions or inconsistencies, it is the duty of the trier of fact to consider the same in determining the weight given to the testimony.  *Reed v. Knol*, 7 Ill. App. 3d 163, 166 (1972).  Moreover, inconsistency or contradiction in a witness's testimony does not necessarily destroy the credibility of a witness as a matter of law.  *Id*.  Again, we are bound by the standard of

17

review and may not reweigh the evidence or determine whether Russ or Frankie was more credible, as the circuit court was in a superior position to make such a determination and did so. See *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. Indeed, even if a different conclusion could have been drawn from the evidence, we will not set aside the circuit court's findings unless a contrary conclusion is clearly apparent. See *id.* Our duty is to simply review the record to determine whether evidence exists to support the circuit court's decision. See *Nokomis Quarry Co.*, 333 Ill. App. 3d at 484. If there is such supporting evidence in the record, we uphold the circuit court's decision. *Id.* While there is obvious conflicting testimony in the record, some of the testimony indeed supports the circuit court's conclusion.

¶ 43    Besides testimony, additional evidence in the record supports the circuit court's decision. Frankie became aware of all the checks written against the trust when she accessed the trust records, all of which were set forth in her demand letter. Moreover, in his response, Russ itemized the purchases that he alleged that Frankie approved and he declined to include that amount in his reimbursement. The checks disputed at the trial were included in Frankie's demand and Russ's response, but they were omitted from Frankie's complaint, which was filed after Russ sent the reimbursement for the purchases that he admitted were inappropriate.

¶ 44    Although Frankie filed a motion to amend her complaint to conform to the dollar amount she sought at the trial—which she was wholly authorized to do—it is nonetheless noteworthy that Exhibit C appended to Frankie's original complaint contained a list of unapproved expenditures that were itemized by check number, payee, and amount.

18

Itemizing a list of unapproved expenses implies that any expenses omitted from that list were approved. As noted by the circuit court in its order denying the motion to reconsider, none of the disputed expenditures set forth in Exhibit C existed at the time of trial, there was no evidence offered at trial as to what happened to the alleged wrongful expenditures in Exhibit C, and at some point Frankie changed to new expenditures she deemed improper. Accordingly, the circuit court indicated that it was not convinced that Frankie had disapproved of the expenses challenged at the trial.

¶ 45 The circuit court emphasized in its order denying the motion to reconsider that "[t]his matter comes down to determination of credibility." We agree and, having conducted our analysis within the scope of the standard of review, we defer to the circuit court's credibility determinations. See *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. We cannot say that the circuit court's damage award of $1075 was unreasonable, arbitrary, or not based on the evidence, nor was an opposite conclusion apparent. *Judgment Services Corp.*, 321 Ill. App. 3d at 154. Moreover, the record contains evidence to support the award. *Nokomis Quarry Co.*, 333 Ill. App. 3d at 484. Accordingly, we conclude that the damages award was not against the manifest weight of the evidence. *Id*.

¶ 46 On a final note regarding this issue, Frankie contends in her brief that the circuit court was concerned that the proof at trial did not conform to the allegations of the complaint. She claims the circuit court "may have been concerned that [Russ] was surprised or prejudiced in that the specific expenditures complained of at trial did not conform to the specific expenditures complained of in the [c]omplaint." We disagree. The circuit court granted Frankie's motion to amend the complaint to conform to the proof and,

19

in its order, considered the evidence before it at trial. The circuit court was free to observe that the expenses Frankie deemed inappropriate at the outset changed at some time before the trial. In making its observations about Exhibit C, the circuit court made clear that it was resolving an issue of overall credibility and compared the allegations in the complaint with the allegations at trial for that purpose.

¶ 47                                III. Interest

¶ 48    The second issue for our consideration is whether the circuit court erred by denying Frankie's claim for interest. "The determination of whether circumstances support an award of interest is within the sound discretion of the trial court." *Jones v. Hryn Development, Inc.*, 334 Ill. App. 3d 413, 418 (2002). "Such a determination will not be disturbed on review unless it constitutes an abuse of discretion." *Id*. at 418-19. "An abuse of discretion is found only when no reasonable person would take the view adopted by the trial court." *In re Marriage of Polsky*, 387 Ill. App. 3d 126, 135 (2008).

¶ 49    Here, the circuit court awarded $1075 for the check written in that amount payable to Rollinson's. Russ initially testified that the purchase in that amount was for items used in Bosco's bedroom, but later admitted that he was not certain the purchase was entirely for Bosco. The circuit court opted to deny any interest on the $1075. We conclude that this decision was not an abuse of discretion, as we cannot say that no reasonable person would have decided this way. See *id*.

¶ 50                              IV. Attorney Fees

¶ 51    The next issue for our consideration is whether the circuit court erred by not awarding Frankie the full amount of attorney fees requested. Frankie petitioned the circuit

20

court for $8246.50. The circuit court awarded her $487. On appeal, Frankie cites *In re Estate of Halas*, 209 Ill. App. 3d 333, 352 (1991), which observed that it is within the discretion of the circuit court to award attorney fees when willful misconduct or gross negligence results in a loss sustained by a trust. Here, Frankie argues that the circuit court's failure to award the full amount of attorney fees results in a depletion of Bosco's trust funds due to Russ's misconduct as a co-trustee.

¶ 52 The circuit court stated that the attorney fees award represented the amount that Frankie's attorney billed up to the time when Frankie received Russ's reimbursement check. Anything billed beyond that point was not related to any willful misconduct or gross negligence on Russ's part. As we concluded in the issue on damages, the circuit court correctly found that the expenses disputed at trial were appropriate, apart from the $1075 check to Rollinson's. Notably, the case cited by Frankie indicates that, even in the case of willful misconduct or gross negligence, any award of attorney fees is *discretionary* by the circuit court. See *id.* The circuit court's discretion remains in the presence or absence of willful misconduct. We cannot say that the attorney fees award was unreasonable, arbitrary, or not based on the evidence, nor was an opposite conclusion apparent. *Judgment Services Corp.*, 321 Ill. App. 3d at 154. Accordingly, we conclude that the attorney fees award was not against the manifest weight of the evidence. *Id.*

¶ 53                              V. Custodial Accounts

¶ 54 The final issue on appeal is whether the circuit court erred by not removing Russ as custodian of the parties' daughters' accounts. Frankie argues that because Russ misappropriated funds from Bosco's trust, he is not trustworthy to continue as custodian

21

over the daughters' accounts. Evidence at the trial showed that no money was ever removed from the daughters' accounts and the balance of the accounts had increased significantly since the accounts were established. Frankie conceded at the trial that there were no misappropriations but indicated that she did not trust Russ to oversee the accounts. After observing the evidence, the circuit court denied Frankie's request to remove Russ as custodian of the accounts, but to address her concern, ordered Russ to allow Frankie free access to the accounts. We cannot say this decision was unreasonable, arbitrary, or not based on the evidence or that an opposite conclusion was apparent. *Judgment Services Corp.*, 321 Ill. App. 3d at 154. Accordingly, the decision was not against the manifest weight of the evidence. *Id.*

¶ 55                          VI. Additional Considerations

¶ 56   In conclusion, we observe comments in Frankie's brief regarding the burden of proof. To state a claim for breach of fiduciary duty, a plaintiff must establish a fiduciary duty on the part of the defendant, the defendant's breach of that duty, and damages that were proximately caused by the defendant's breach. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). Only after a plaintiff establishes that the fiduciary has engaged in self-dealing involving a breach of the duty of loyalty does the burden of proof shift to the fiduciary to prove by clear and convincing evidence that the transactions were equitable and just. *Labovitz v. Dolan*, 189 Ill. App. 3d 403, 413 (1989).

¶ 57   Here, Frankie claims that the circuit court applied the wrong burden of proof. She argues that Russ, "having clearly breached his fiduciary duty," had the burden to prove that the transactions at issue were equitable. See *id*. We disagree. The whole purpose of the

22

trial was to determine *whether* Russ breached his fiduciary duty regarding the purchases he excluded from his reimbursement check. Russ's admission of breach of fiduciary duty was solely related to the purchases he admitted were improper before the trial commenced. In contrast, Russ never admitted to breach of fiduciary duty regarding the purchases at issue at the trial. It was *after* Russ admitted his wrongdoing and submitted the check that Frankie filed the lawsuit. Accordingly, at trial, the burden was on Frankie to establish that Russ breached his fiduciary duty as to the remaining expenses. Any breach of fiduciary duty Russ admitted to *before* the trial has no bearing on Frankie's burden of proof to establish a breach of fiduciary duty regarding the purchases challenged *at* the trial. The only purchase the circuit court found to be a breach of Russ's duty as co-trustee was the $1075 check to Rollinson's. Accordingly, the burden was then on Russ to prove that the purchase at Rollinson's was fair and equitable. However, he never attempted to dispute the circuit court's finding. For these reasons, we reject Frankie's arguments regarding the burden of proof.

¶ 58                                      CONCLUSION

¶ 59    For the foregoing reasons, we affirm the circuit court's April 15, 2019, order.


¶ 60    Affirmed.

23